**Supreme Court**

No. 2008-51-C.A.
(P2/05-1037CR)

State                           :

    v.                          :

Jeffrey Moten.                  :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

**Supreme Court**

No. 2008-51-C.A.
(P2/05-1037CR)
Concurring and dissenting
Opinion begins on Page 18

|  |  |
|---|---|
| State | : |
| v. | : |
| Jeffrey Moten. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.**  On December 5, 2006, a Providence County Family Court jury found the defendant, Jeffrey Moten, guilty of first degree child abuse for inflicting serious bodily injury on his infant daughter, Nashya Moten.  On May 10, 2007, the trial justice sentenced the defendant to twenty years, with eighteen years to serve and two years suspended with probation, along with one hundred hours of community service.

On appeal, defendant contends that his right to confrontation under both the United States and Rhode Island constitutions was violated when the trial justice allowed a pediatrician to testify regarding out-of-court statements made by a colleague of hers—an ophthalmologist who performed a retinal exam on the injured infant.  For the reasons set forth in this opinion, we affirm the judgment of conviction.

# I

## Facts and Travel

The state charged defendant with one felony count pursuant to G.L. 1956 § 11-9-5.3(b)(1) in connection with injuries suffered by Nashya on November 23, 2005.[1] The just-cited statute provides that a person is guilty of first degree child abuse "[w]henever a person having care of a child * * * knowingly or intentionally * * * [i]nflicts upon [that] child serious bodily injury." Id. The statute then defines "serious bodily injury" as being, inter alia, "physical injury that * * * [e]vidences subdural hematoma, intercranial hemorrhage and/or retinal hemorrhages as signs of 'shaken baby syndrome' and/or 'abusive head trauma.'" Section 11-9-5.3(c)(4).

The defendant's jury trial began on November 30, 2006 in the Family Court.[2] The prosecution called four witnesses during its case-in-chief: (1) Amie Costa (Nashya's mother); (2) Detective Arthur Lee (the investigating officer from the Youth Services Bureau of the Providence Police Department); (3) Dr. Nancy Harper (the pediatrician who treated Nashya's injuries); and (4) Detective Paul Renzi (an officer in the Providence Police Department who investigated Ms. Costa's apartment on the night of the incident). During his testimony, Det. Lee also read into evidence two statements given by defendant to the police during the investigation.

---

[1]   For the sake of brevity, we shall hereinafter generally refer to what occurred on November 23, 2005 simply as "the incident."

[2]   The defendant was charged with child abuse under G.L. 1956 § 11-9-5.3 by criminal information on March 6, 2006. At that time, § 11-9-9 provided the Family Court with exclusive original jurisdiction over all offenses set forth in § 11-9-5.3. We note that, on July 3, 2006, the General Assembly enacted two public laws (viz., P.L. 2006, ch. 260, § 1 and P.L. 2006, ch. 290, § 1) which transferred jurisdiction of child abuse cases to Superior Court. However, since we have recognized that the prior version of the law applied to criminal defendants who were charged by information prior to July 3, 2006, defendant was properly tried in Family Court. See generally State v. Jennings, 944 A.2d 171 (R.I. 2008).

The defendant stipulated that the statements, taken on November 24 and December 2, 2005, were "freely and voluntarily taken and given by the Defendant and executed at the Providence Police Station." Finally, the prosecution read into evidence a stipulated statement from Christopher Hereth—a friend of defendant who stated that he had visited defendant on the afternoon of the incident.

As the trial justice noted in the course of denying defendant's motion for judgment of acquittal, the trial involved "very little disputed testimony"; he added that the testimony "which may [have been] characterized as [disputed[3] was], frankly, somewhat minor." Since defendant's sole contention on appeal deals with a narrow issue regarding a portion of Dr. Harper's testimony, we shall provide the reader with an abbreviated rendition of the testimony as relayed by the witnesses and stipulated statements.

Nashya Moten was born on June 30, 2005 to Ms. Costa and defendant. The events that led to the criminal charge in this case occurred on November 23 of that same year. On that day, Nashya was just shy of being five months old. At the time, defendant, Ms. Costa, Nashya, and three dogs lived in a rented apartment in Providence. On the morning of November 23, Ms. Costa left Nashya at the apartment in defendant's care when she departed for work. Ms. Costa testified that, before she left the apartment, Nashya was "just cooing noises, looking at [her], smiling at [her]"; that Nashya's "eyes were fine"; and that Nashya was responsive to sounds.

Ms. Costa returned from work between 3:30 and 3:45 that afternoon. When she arrived at the apartment, she heard Nashya making what she described at trial as a "weird scream/cry." She picked up her daughter and "noticed that [Nashya's] eyes were stuck in the [upper right] corner of her head not moving, not following any verbal sounds." Nashya also did not respond

---

[3]     In actuality, the word "undisputed" appears at this point in the transcript. It is clear from the context, however, that "disputed" is what was meant.

to visual prompts.  Ms. Costa further testified that her daughter was "just kind of lifeless."  She stated that Nashya "didn't really say anything or do anything."  Ms. Costa added that Nashya "just was doing that weird scream/cry."  The mother proceeded to call Nashya's pediatrician, who recommended that she take Nashya to the hospital immediately.  Ms. Costa then drove her daughter to Hasbro Children's Hospital.

In a statement given to the police at 12:40 a.m. on November 24, defendant confirmed that he was babysitting Nashya when Ms. Costa left for work the previous morning.  He stated that he and Nashya eventually took a nap together after Ms. Costa left.  He added that, after sleeping for about two hours, he woke up with a stomachache and had to use the bathroom.  He stated that, while he was in the bathroom, he "heard the dogs moving around," and that he "told them to go lay down."  He added that he then "heard [his] daughter fall down out of bed, and she screamed like [he had] never heard her scream before."  The defendant told the police that he "ran to her" and "picked her up right away" in order to check on her condition; he said that Nashya did not have any bruises or marks, nor was she bleeding.  He stated that he then "beat the dogs because [he] thought they knocked [Nashya] off of the bed."  According to defendant's statement, this all happened "20 minutes before [Ms. Costa] came home."  At trial, Ms. Costa also testified that, when she came home from work, defendant "told [her] that the dogs did it."

### Doctor Harper's Testimony

Doctor Nancy Harper testified at trial as both a fact witness and as an expert witness in the field of child pediatrics and child abuse pediatrics.[4]

---

[4]     Doctor Harper's testimony was not limited to the facts described in this section.  For example, she provided extensive testimony regarding the diagnoses, symptoms, and causes of various conditions that can affect the brains of children.  However, since most of her testimony is not relevant to the narrow issue presented on appeal, our rendition of Dr. Harper's testimony is limited.

Doctor Harper stated that she was a board-certified pediatrician and a fellow in the Child Protection Program at Rhode Island Hospital. Doctor Harper was on call on November 23, 2005. That night, she received a call from a resident in the emergency room who told her that she was "very worried" about an infant at the hospital (Nashya) whose "eyes were straight upwards and not moving." The resident also stated that Nashya was "lethargic" and seemed to be suffering from "seizures and a headache." Doctor Harper then went to the hospital, arriving at the emergency room at approximately 6 p.m.

When Dr. Harper arrived, she discussed Nashya's condition with an emergency room resident. She then reviewed Nashya's CAT scan, consulted with a pediatric radiologist, examined the baby, and spoke with Ms. Costa. Doctor Harper became "quite concerned" when she reviewed the images from Nashya's CAT scan, which showed "too much fluid around the brain, which is concerning for subdural hemorrhages." Additionally, Dr. Harper testified that there appeared to be "new blood" around the brain.

When interviewing Ms. Costa, Dr. Harper became concerned after Ms. Costa reported that "the baby wasn't acting normally and not following with the eyes" when Ms. Costa came home from work. Doctor Harper stated that Nashya "showed signs of injury to her brain" and that these injuries were "potentially life threatening" and "were just not consistent with an accidental injury." Doctor Harper testified that, because she was a mandatory reporter of child abuse and neglect,[5] she contacted the Department of Children, Youth and Families that evening to report the incident.

---

[5]    General Laws 1956 § 40-11-6(a) provides that "[w]hen any physician * * * has cause to suspect that a child brought to him or her or coming to him or her for examination, care, or treatment, is an abused or neglected child * * * he or she shall report the incident or cause a report thereof to be made to the [Department of Children, Youth and Families]."

Doctor Harper indicated that, in the course of her treatment, she spoke "with physicians * * * to recommend other tests that need[ed] to be done." One of the physicians contacted by Dr. Harper was an "ophthalmology doctor on call," whom she asked "to come and examine [Nashya's] eyes for [Dr. Harper]." Doctor Harper testified that she could not recall the ophthalmologist's name, but knew that he was "a resident on duty." The ophthalmologist arrived at "9 or 10 p.m." and performed a "dilated eye exam." Doctor Harper explained:

> "Pediatricians and other physicians are trained to look at the back of the eyes. But, of course, we are not the experts, which is why ophthalmology is contacted. He put drops in her eyes to dilate the pupils so they can see the back of the eye; and they use a special lens and magnification system so they can look at the retina at the back of the eye. He completed the evaluation and came and talked with me and reported to me that she had * * *."

At this point during Dr. Harper's testimony, defense counsel interrupted her answer by saying "Objection"—a challenge that the trial justice immediately sustained without any discussion. The prosecutor then continued questioning Dr. Harper as follows:

> "Q: Did you have a conversation with this ophthalmologist as to his observations of the results of this exam?
>
> "A: Of course, just like talking with the radiologist, we review all of the tests that are performed on the children.
>
> "Q: And did you—strike that. In other cases, you've reviewed eye exams with ophthalmologists, correct?
>
> "A: That is correct.
>
> "Q: And do you need this information for a complete assessment of Nashya?
>
> "A: Yes.
>
> "Q: And did you need it to further your information for the treatment of Nashya, as well as the diagnosis?
>
> "A: Yes.
>
> "Q: And what did he tell you.

- 6 -

"DEFENDANT'S ATTORNEY: Objection.

"THE COURT: Overruled. You may answer."

Doctor Harper then testified that the ophthalmologist told her "that Nashya had extensive retinal hemorrhages that covered the entire back of the eye." The ophthalmologist also told Dr. Harper that Nashya had "a large hemorrhage which was obscuring or covering the macular in her right eye," which is "the area where you get your best vision."

Doctor Harper testified that the same exam was repeated the next morning and on several other occasions "in the weeks and months to come" for the following reason:

> "[O]nce you have hemorrhages in the eye, it can keep you from seeing well. And if you can't see well, and when you're young and trying to develop your vision, it can cause permanent difficulties * * *. You may even go blind. So, there are grave concerns once you see these injuries to the back of the eye. You have to follow them closely and to make sure that she sees clearly and to make sure that the baby doesn't need surgery on the eye. It's a concerning point."

Doctor Harper went on to provide more details about Nashya's treatment and condition, which was "consistent with abusive head trauma." She stated that there was "no medical, organic or other [etiology] for her injuries other than inflicted injury." Doctor Harper testified that Nashya's injuries "[were] not consistent with a fall from a bed," that they "could not have been caused from the dogs," and that they were "not consistent with an accidental injury."

On December 5, 2006, the jury found that defendant was guilty of first degree child abuse under § 11-9-5.3(b)(1). The defendant then filed a motion for a new trial, which the trial justice denied on December 18, 2006. On May 10, 2007, the trial justice sentenced defendant to twenty years, with eighteen years to serve and two years suspended with probation, along with one hundred hours of community service. The defendant filed a timely notice of appeal.

## II

### Issue on Appeal

On appeal, defendant contends that his constitutional right of confrontation was violated during Dr. Harper's testimony. Specifically, defendant argues that the statements made by the ophthalmologist to Dr. Harper regarding Nashya's retinal hemorrhaging[6] were "testimonial evidence" under Crawford v. Washington, 541 U.S. 36 (2004). In his brief to this Court, defendant (quoting Davis v. Washington, 547 U.S. 813, 822 (2006)) maintains that the ophthalmologist made these statements with the "primary purpose of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" The defendant contends that, given the testimonial nature of the statements, Dr. Harper should not have been allowed to testify about the ophthalmologist's diagnosis because defendant did not have an opportunity to cross-examine the ophthalmologist.

## III

### Standard of Review

When a criminal defendant claims on appeal that the introduction of certain evidence violated his constitutional rights of confrontation and cross-examination, we review such an evidentiary ruling in a de novo manner. State v. Lopez, 943 A.2d 1035, 1041 (R.I. 2008); see also State v. Barkmeyer, 949 A.2d 984, 1002 (R.I. 2008) ("This Court reviews de novo a party's allegation that a constitutional right has been infringed."); State v. Quinlan, 921 A.2d 96, 106

---

[6] Under the General Laws, "retinal hemorrhages" are evidence of "'shaken baby syndrome' and/or 'abusive head trauma'"—conditions that can provide the basis for a first degree child abuse charge. See G.L. 1956 § 11-9-5.3.

(R.I. 2007) ("[I]n determining whether a defendant's constitutional rights have been violated, this Court undertakes de novo review.").

## IV

## Analysis

The Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution "guarantee individuals accused of criminal charges the right to confront and cross-examine any adverse witnesses who testify against them." State v. Albanese, 970 A.2d 1215, 1222 (R.I. 2009) (internal quotation marks omitted). The defendant's sole contention on appeal is that he was deprived of his constitutional right of confrontation. Specifically, he argues that the trial justice should not have allowed Dr. Harper to testify about statements made by the ophthalmologist who treated Nashya on the night of the incident because defendant did not have an opportunity to cross-examine that ophthalmologist. It is our opinion, however, that defendant failed to preserve the right of confrontation issue for appellate review.

This Court has long adhered to the "raise or waive" rule, pursuant to which "an issue that has not been raised and articulated previously at trial is not properly preserved for appellate review." See State v. Gomez, 848 A.2d 221, 237 (R.I. 2004) (internal quotation marks omitted); see also State v. Figuereo, 31 A.3d 1283, 1289 (R.I. 2011) (recognizing that this Court "will not review issues that were not presented to the trial court in such a posture as to alert the trial justice to the question being raised" (internal quotation marks omitted)). We "staunchly adhere[]" to this procedural principle. Figuereo, 31 A.3d at 1289. The rule is not "some sort of artificial or arbitrary Kafkaesque hurdle." DeMarco v. Travelers Insurance Co., 26 A.3d 585, 628 n.55 (R.I. 2011). Instead, the rule serves as an "important guarantor of fairness and efficiency in the judicial process." Id.

In the context of challenging evidence offered at trial, we have repeatedly cautioned that "a general objection is not sufficient to preserve an issue for appellate review; rather, assignments of error must be set forth with sufficient particularity to call the trial justice's attention to the basis of the objection." Union Station Associates v. Rossi, 862 A.2d 185, 192 (R.I. 2004) (emphasis added); see also State v. Diefenderfer, 970 A.2d 12, 30 (R.I. 2009) ("When we * * * consider defense counsel's quite unspecific utterances[,] * * * it is clear that the issue that defendant seeks to raise on appeal * * * has not been preserved."); State v. Feliciano, 901 A.2d 631, 646 (R.I. 2006) ("Our case law states with abundant clarity that issues that were not preserved by a specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal." (emphasis added) (internal quotation marks omitted)).

The defendant contends that his argument regarding the right of confrontation was preserved when defense counsel said "Objection" as Dr. Harper was about to testify regarding what the ophthalmologist had told her. Defense counsel uttered that word twice—on the first occasion, the objection was sustained; the second time, it was overruled. In neither instance, however, did defense counsel articulate the basis for his objection. Based on our well-settled "raise or waive" rule, an objection without explanation is insufficient to preserve an issue on appeal. See Feliciano, 901 A.2d at 646 ("General objections to the admissibility of evidence, when the context does not supply the specific ground for the objection, are thus insufficient to preserve the issue.").

The defendant attempts to save his insufficient objection for appellate review by contending that "it was clear that counsel was objecting to his inability to confront the doctor." In our view, however, it is equally—if not more—plausible that the prosecutor and the trial

justice understood defendant's objection to be on hearsay grounds.[7]  See State v. Vieira, 38 A.3d 18, 25 (R.I. 2012) (rejecting appellant's argument that the grounds for an unspecified objection were "clear from the context" and holding that an argument was waived where counsel "failed * * * to articulate any basis whatsoever for her objection" (internal quotation marks omitted)). When defendant objected, Dr. Harper was about to testify regarding what the ophthalmologist had told her on the night of the incident.[8]  At an earlier point in Dr. Harper's testimony, defendant objected during a similar line of questioning when the prosecutor asked Dr. Harper about information she had learned from another emergency room resident.  When defendant objected in that instance, the trial justice held a sidebar conference during which there was a colloquy regarding Rule 803(4) of the Rhode Island Rules of Evidence—which sets forth the exception to the hearsay rule for "[s]tatements made for purposes of medical diagnosis or treatment."  It would have been entirely reasonable for the trial justice to have inferred that defense counsel had the same objection in mind when Dr. Harper was about to testify in a similar fashion regarding her conversation with the ophthalmologist.

The foundation laid by the prosecutor in between defendant's two bare objections also strongly suggests that the state was again seeking to avail itself of the hearsay exception set forth

---

[7]     A hearsay objection is not equivalent to an objection based on the constitutional right to confront a witness.  See, e.g., United States v. Cabrera-Beltran, 660 F.3d 742, 751 (4th Cir. 2011) ("The hearsay objection at trial cannot be understood to include a Confrontation Clause objection."); United States v. Arbolaez, 450 F.3d 1283, 1291 n.8 (11th Cir. 2006) ("A hearsay objection to testimony at trial, standing alone, does not preserve a constitutional challenge under the Confrontation Clause for appeal."); United States v. Dukagjini, 326 F.3d 45, 60 (2d Cir. 2003) (noting that "a hearsay objection would not in itself preserve a Confrontation Clause claim").

[8]     The question that led to the second objection reads as follows:

> "Q: And what did [the ophthalmologist] tell you.
> "DEFENDANT'S ATTORNEY: Objection.
> "THE COURT: Overruled."

in Rule 803(4). After defendant's initial successful objection to the testimony regarding the ophthalmologist's findings, the prosecutor then asked Dr. Harper if the information provided by the ophthalmologist was necessary "for the <u>treatment</u> of Nashya, as well as the <u>diagnosis</u>." (Emphasis added.) Doctor Harper replied, "Yes." After this clarification, the prosecutor again asked Dr. Harper about her conversation with the ophthalmologist. The defendant again objected, but this time the trial justice allowed Dr. Harper to answer. The just-summarized evidentiary foundation laid by the prosecutor tracked the hearsay exception found in Rule 803(4) (creating a hearsay exception for "[s]tatements made for purposes of medical <u>diagnosis</u> or <u>treatment</u>" (emphasis added)). The defendant could have clarified his objection by articulating a right to confrontation argument, but he did not do so.

While it may be possible that defense counsel had the Confrontation Clause in mind, he made no reference to the same. Further, the foundation laid by the prosecutor shows that it is likely that both the prosecutor and the trial justice understood his objections to be on hearsay grounds. Ultimately, however, any journey into the mind of defense counsel, the prosecutor, or the trial justice amounts to speculation; it is a fruitless effort that brings to the fore the very purpose of the "raise or waive" rule. We shall never know precisely why defendant objected to the line of questioning because he never articulated a reason to the court. <u>See</u> <u>Tinney v. Tinney</u>, 770 A.2d 420, 433 (R.I. 2001) (noting that a party may not "raise an issue * * * on appeal that was not adequately raised below by presuming now the basis for the evidence's admission and tailoring his objection to that presumed basis"). The defendant failed to adequately raise his constitutional argument at trial.

Our inquiry, however, is not over. We have recognized a "narrow exception" to the "raise or waive" rule. <u>State v. Dennis</u>, 29 A.3d 445, 449–50 (R.I. 2011). For the exception to

apply, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." State v. Breen, 767 A.2d 50, 57 (R.I. 2001); see also State v. Burke, 522 A.2d 725, 731 (R.I. 1987) ("[W]hen an intervening decision of this [C]ourt or of the Supreme Court of the United States establishes a novel constitutional doctrine, counsel's failure to raise the issue at trial will not preclude our review."). We hold that this narrow exception may not be invoked in this case because defendant's argument was not novel at the time Dr. Harper testified.

On March 8, 2004, the Supreme Court of the United States issued its decision in Crawford v. Washington, 541 U.S. 36 (2004). The Crawford opinion abrogated the rule announced in Ohio v. Roberts, 448 U.S. 56 (1980), which was the decision that previously provided the analytical framework for the Sixth Amendment right to confrontation. The Roberts Court had stated that "an unavailable witness's out-of-court statement may be admitted so long as it has adequate indicia of reliability—i.e., falls within a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" See Crawford 541 U.S. at 42 (quoting Roberts, 448 U.S. at 66). After reviewing the historical underpinnings of the Confrontation Clause, Justice Scalia, writing for the majority in Crawford, described the Roberts rule as a "framework * * * so unpredictable that it fails to provide meaningful protection from even core confrontation violations." Id. at 63.

The Court in Crawford recognized that the Roberts rule "replac[ed] categorical constitutional guarantees with open-ended balancing tests," which would "do violence to their design." Crawford, 541 U.S. at 67–68. In order to maintain the integrity of the Sixth Amendment's guarantee, Crawford adopted a new analytical approach to be employed with

respect to evidentiary challenges based upon the Confrontation Clause: "Where testimonial evidence is at issue, * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Crawford, 541 U.S. at 68. The Court recognized that its decision did not "articulate a comprehensive definition" of "testimonial." Id. at 68 n.10. It did, however, recognize a "core class" of testimonial statements. Id. at 51–52.

The Supreme Court has stated that "Crawford announced a new rule" of constitutional law. Whorton v. Bockting, 549 U.S. 406, 416 (2007); cf. State v. Harris, 871 A.2d 341, 345 n.12 (R.I. 2005) (noting that "Crawford probably constitutes a novel issue of law"). However, defendant does not contend that the Crawford decision constitutes the sort of "novel rule" pursuant to which the narrow exception to the "raise or waive" rule may be invoked. Nor could he; Crawford was decided on March 8, 2004—more than two-and-a-half years before Dr. Harper gave her testimony.

Instead, defendant argues that two cases decided after Crawford—viz., Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009) and Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011)— serve as "intervening decision[s] * * * of the Supreme Court of the United States [that] establish[] a novel constitutional doctrine * * *." See Burke, 522 A.2d at 731. In Melendez-Diaz, a defendant charged with a drug offense challenged affidavits provided by analysts at a state laboratory. The affidavits included forensic analysis, and they stated that the substance seized by the police in connection with the defendant's alleged crime was cocaine. The Supreme Court held that the affidavits were examples of "testimonial evidence" under Crawford, recognizing that the sworn statements were "made under circumstances which would lead an

objective witness reasonably to believe that the statement would be available for use at a later trial." Melendez-Diaz, 557 U.S. at 311 (quoting Crawford, 541 U.S. at 52).

Bullcoming involved a similar situation. In that case, the defendant was convicted of aggravated driving while intoxicated. At trial, the prosecution introduced a certified blood alcohol concentration report into evidence. However, it did so through the testimony of an analyst who had not conducted the actual forensic analysis. The Supreme Court held that such "surrogate testimony * * * does not meet the constitutional requirement" of the Sixth Amendment. Bullcoming, 131 S. Ct. at 2710. The decision reiterated that the "accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." Id.

Both Bullcoming and Melendez-Diaz merely apply the rule announced in Crawford. Therefore, those cases cannot be considered to have established a "novel constitutional rule." See Butler v. Curry, 528 F.3d 624, 634 (9th Cir. 2008) ("[W]hen a general rule must be applied in a new situation, it can hardly be thought to have created a new principle of constitutional law." (internal quotation marks omitted)). Crawford was the case that breathed new life into the Confrontation Clause. The Court announced a broad rule based on a "categorical constitutional guarantee[]": "Where testimonial evidence is at issue, * * * the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Crawford, 541 U.S. at 67, 68.

Certainly, at the time of defendant's trial, the Supreme Court had not established the precise contours of what is and what is not "testimonial evidence." That does not mean, however, that each Supreme Court case applying Crawford announces "a novel constitutional rule." The basic principle was established at the moment when Crawford was published: if a

- 15 -

prosecutor seeks to introduce evidence of testimonial statements where the defendant did not have an opportunity to cross-examine the declarant, the defendant has a basis for objecting under the Sixth Amendment. Notably, the defendants in both Melendez-Diaz and Bullcoming were sufficiently aware of the principle established by Crawford to object on those grounds at trial. See Bullcoming, 131 S. Ct. at 2712 ("Without Caylor's testimony, defense counsel maintained, introduction of the analyst's finding would violate Bullcoming's Sixth Amendment right to be confronted with the witnesses against him." (internal quotation marks omitted)); Melendez-Diaz, 557 U.S. at 309 ("Petitioner objected to the admission of the certificates, asserting that our Confrontation Clause decision in Crawford * * * required the analysts to testify in person.").

Bullcoming or Melendez-Diaz might have established a novel constitutional rule if Crawford had announced that only statements made to police constituted "testimonial" statements. But Crawford contained no suggestion that the principle which it announced would be so limited. Indeed, the opinion included "[v]arious formulations" of what the Court called a "core class" of testimonial statements. Crawford, 541 U.S. at 51. Included among those formulations were "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Crawford, 541 U.S. at 52. The defendant's brief to this Court bases its argument on this category, noting that "an objective witness [would] reasonably * * * believe that the resident's statements would be available for use at a later trial." However, the conceptual basis for that precise argument was laid in Crawford—not in Melendez-Diaz or Bullcoming.

The defendant appears to conflate the concept of "a novel constitutional rule" with an established constitutional rule that is applied to a novel fact pattern. For example, defendant argues that "Melendez-Diaz was the first time that the Crawford line of case[s] had been applied

- 16 -

to what previously had been considered 'neutral' scientific evidence not subject to the confrontation clause." That may well be true, but the new application did not expand or otherwise alter the basic principle that was announced in <u>Crawford</u>. The majority opinion in <u>Melendez-Diaz</u> explicitly noted that the decision in that case constituted a "rather straightforward application of [the Supreme Court's] holding in <u>Crawford</u>." <u>Melendez-Diaz</u>, 557 U.S. at 312. Other courts have similarly stated that <u>Melendez-Diaz</u> did nothing more than apply <u>Crawford</u> to a different set of facts—a scenario that surely does not constitute "a novel constitutional rule." <u>See, e.g.</u>, <u>Peak v. Webb</u>, 673 F.3d 465, 480 (6th Cir. 2012) (noting that <u>Melendez-Diaz</u> "did not provide a new or novel interpretation of the Confrontation Clause"); <u>Hatley v. State</u>, 722 S.E.2d 67, 70 (Ga. 2012) ("Some of the Confrontation Clause issues left unanswered by <u>Crawford</u> were clarified in <u>Melendez–Diaz</u>."); <u>State v. Sorensen</u>, 814 N.W.2d 371, 376 (Neb. 2012) ("The Court subsequently clarified the meaning of 'testimonial' in <u>Melendez–Diaz v. Massachusetts</u> and <u>Bullcoming v. New Mexico</u>."); <u>State v. Kennedy</u>, 735 S.E.2d 905, 926 n.22 (W. Va. 2012) ("<u>Bullcoming</u> [and] <u>Melendez–Diaz</u> * * * merely clarify and apply <u>Crawford</u>'s principles * * *.").

The "narrow exception" to the "raise or waive" rule applies to novel constitutional rules. It is not available when the Supreme Court applies a familiar constitutional rule to a novel fact pattern. If that were the standard, then virtually every constitutional decision of the Supreme Court would provide defendants an opportunity to take advantage of the exception. There would be nothing "narrow" about such an outcome, nor would that outcome further the rule's purpose of "fairness and efficiency in the judicial process." <u>See</u> <u>DeMarco</u>, 26 A.3d at 628 n.55. Because the defendant's argument is based on a constitutional rule that was not novel at the time of his

trial, the defendant's bare objection does not fit within the narrow exception to our "raise or waive" rule.

## V

## Conclusion

For the reasons set forth in this opinion, we affirm the Superior Court's judgment of conviction. The record in this case may be returned to that tribunal.

**Flaherty, J., and Indeglia, J., dissenting in part and concurring in the result.** Hindsight is always twenty-twenty—especially when afforded the benefit of almost seven years of clarifying United States Supreme Court jurisprudence. After a careful review of Crawford v. Washington, 541 U.S. 36 (2004), and its progeny, we respectfully have concluded that we must write separately.

We are unable to agree with the majority's conclusion that, by failing to raise a specific objection under the Confrontation Clause to certain testimony presented at trial, Moten has waived that argument on appeal.[9] In our opinion, Moten's objection under the Confrontation Clause was novel at the time Dr. Harper testified to the out-of-court statements made by the ophthalmologist regarding a retinal examination that the ophthalmologist had performed on the injured infant. Therefore, this Court should have reached the merits of whether these out-of-court statements were testimonial in nature. Although we ultimately conclude that those

---

[9] Moten did object to the admission of this testimony on what could have been understood to be hearsay grounds, which the trial justice overruled. It is noteworthy that in a decision issued just before the trial in this case commenced, this Court left for another day the decision as to "whether a defendant's unsuccessful objection to a statement on hearsay grounds alone would have preserved the Crawford issue for review on appeal." State v. Harris, 871 A.2d 341, 345 n.11 (R.I. 2005).

statements were nontestimonial and that, therefore, their admission did not violate Moten's right of confrontation, we cannot agree with the majority that Moten's failure to articulate the Confrontation Clause as the basis for his objection to that portion of Dr. Harper's testimony precludes him from raising that argument before this Court on appeal.

## Preservation of Error

As the majority points out, this Court recognizes a narrow exception to our well-settled "raise or waive" rule. For that exception to apply, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." State v. Breen, 767 A.2d 50, 57 (R.I. 2001).

The majority concedes that, "[c]ertainly, at the time of defendant's trial, the [United States] Supreme Court had not established the precise contours of what is and what is not 'testimonial evidence.'" In fact, the Crawford Court explicitly acknowledged that it declined to articulate a comprehensive definition of the term "testimonial," explaining: "[w]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" Crawford, 541 U.S. at 68.[10] It was not until approximately three-and-one-half years after Moten's trial, which took place in 2006, that the United States Supreme Court moved beyond the realm of interrogation and considered whether forensic analyses—statements much more akin to the ophthalmologist's out-of-court statements made to Dr. Harper—were testimonial in nature and,

---

[10] There is no question that the Crawford Court identified a "core class of 'testimonial statements,'" including extrajudicial statements such as affidavits, depositions, prior testimony, and confession. Crawford v. Washington, 541 U.S. 36, 51-52 (2004). However, the closest the Court came to actually defining—rather than merely describing—the term "testimonial statement" was in its catchall example of "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52.

- 19 -

thus, subject to exclusion under the Confrontation Clause. See Melendez-Diaz v. Massachusetts, 557 U.S. 305, 311 (2009).

Indeed, in Melendez-Diaz, 557 U.S. at 307, the Supreme Court was asked for the first time to identify whether "affidavits reporting the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine * * * [we]re 'testimonial,' [thereby] rendering the affiants 'witnesses' subject to the defendant's right of confrontation under the Sixth Amendment." The Court held that the admission of those affidavits violated the defendant's right of confrontation because the affiants were not available for cross-examination. Id. at 311. In so holding, the Court reasoned that the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial * * *." Id.

Although the Court stated that its holding "involve[d] little more than the application of [the] holding in Crawford," in reality, Melendez-Diaz was pivotal in Sixth Amendment jurisprudence. Melendez-Diaz, 557 U.S. at 329. In its wake, trial judges could do little more than "guess what future rules th[e] Court w[ould] distill from the sparse constitutional text" of the Sixth Amendment. Melendez-Diaz, 557 U.S. at 331 (Kennedy, J., dissenting). Indeed, one year after Melendez-Diaz was decided, the Supreme Judicial Court of Massachusetts observed that the scope of the Confrontation Clause remained "unsettled" and that Crawford's reach "was, and remain[ed], vigorously debated." Commonwealth v. Vasquez, 923 N.E.2d 524, 532 (Mass. 2010). We agree.

Two years after the decision in Melendez-Diaz, the United States Supreme Court decided Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011). There, the Court was asked to address whether the Sixth Amendment allowed "the in-court testimony of an analyst who did not sign [a

- 20 -

testimonial] certification [of a forensic laboratory report concerning the blood alcohol concentration of the defendant] or personally perform or observe the performance of the test reported in the certification." Bullcoming, 131 S. Ct. at 2713. In holding that the defendant had a right to confront the analyst who actually certified that report, the Court cited Melendez-Diaz, 557 U.S. at 319-26, for support that "[a]n analyst's certification prepared in connection with a criminal investigation or prosecution * * * is 'testimonial,' and therefore within the compass of the Confrontation Clause." Bullcoming, 131 S. Ct. at 2713-14. The Court described its decision as "in line with controlling precedent," id. at 2713; however, the dissent maintained, correctly in our view, that "[t]he persistent ambiguities in the Court's approach are symptomatic of a rule not amenable to sensible applications." Id. at 2726 (Kennedy, J., dissenting).

Similarly, when Moten was tried in 2006, this Court had provided little guidance on the application of Crawford. In State v. Feliciano, 901 A.2d 631, 642 (R.I. 2006)—decided a mere five months prior to Moten's trial—this Court stated: "[W]e leave for another day the chore of fleshing out the extent to which the [United States] Supreme Court's elucidation of the Confrontation Clause otherwise affects our case law on the subject, if at all." See also State v. Harris, 871 A.2d 341, 345 n.12 (R.I. 2005) ("[T]he meaning of th[e] term [testimonial] will one day have to be more precisely defined by the courts.").

And so, we are now left to consider whether, at the time of Moten's trial—years before Melendez-Diaz and Bullcoming applied Crawford's reach beyond statements made to police officers—defense counsel could have reasonably known that the admission of out-of-court statements made by one doctor to another regarding the results of a retinal eye examination potentially might violate Moten's right of confrontation. We conclude that, even if those cases did not clearly announce novel rules of law, they certainly employed novel applications to an

- 21 -

unsettled rule of law. In reading the holdings of <u>Melendez-Diaz</u> and <u>Bullcoming</u> as mere applications of <u>Crawford</u>, the majority, in our opinion, does not sufficiently appreciate that both of those cases substantially expanded the scope of the Confrontation Clause.

Today, it is easy to conclude that competent defense counsel would raise an objection under the Confrontation Clause to the disputed portion of Dr. Harper's testimony, but we cannot say that Moten's counsel should have reasonably known that that objection would have been prudent at the time of his trial. <u>See</u> <u>Breen</u>, 767 A.2d at 57. Although it cannot reasonably be disputed that the exception to our "raise or waive" rule is indeed a narrow one, we maintain that the majority effectively reads this exception out of our jurisprudence. The line between a novel rule of law and the application of a rule of law in a new context can sometimes be blurry, if not indistinguishable. We acknowledge that this is a close call, but we cannot fault defense counsel for his failure to forecast <u>Crawford</u>'s application to the facts at issue. Accordingly, we respectfully suggest that the majority should have addressed the Confrontation Clause issue as it relates to the disputed portion of Dr. Harper's testimony to determine whether the trial justice erred in admitting this testimony.

### Application of the "Primary Purpose" Test

We now turn to the merits of Moten's Confrontation Clause challenge. Our inquiry focuses on whether the out-of-court statements made by the ophthalmologist to Dr. Harper concerning the results of a retinal eye test performed on the baby were testimonial in nature. Contending that those statements were testimonial, Moten ascribes error to the admission of that testimony. The state counters that those statements did not violate Moten's right of confrontation, because Dr. Harper essentially testified to her own medical opinions and she was subject to cross-examination. As we noted above, guidance from the United States Supreme

- 22 -

Court on this issue has been less than clear. However, we set forth the law as best we can derive it from applicable precedent.

In determining whether the ophthalmologist's statements were testimonial, we employ the primary purpose test. See Davis v. Washington, 547 U.S. 813, 822 (2006) (Statements "are testimonial when the circumstances objectively indicate that there is no * * * ongoing emergency, and that the[ir] primary purpose * * * is to establish or prove past events potentially relevant to later criminal prosecution."). In so doing, we look to "the circumstances in which the encounter occurs and the statements and actions of the parties." Michigan v. Bryant, 131 S. Ct. 1143, 1156 (2011). If this inquiry reveals that the ophthalmologist's statements were made for the primary "purpose of proving the guilt of a particular criminal defendant at trial" or "to provide a solemn declaration for use at trial," those statements would implicate the Confrontation Clause. Williams v. Illinois, 132 S. Ct. 2221, 2243 (2012) (plurality op.).

Doctor Harper was statutorily obligated, pursuant to G.L. 1956 § 40-11-6,[11] to report suspected child abuse or neglect, as defined in G.L. 1956 § 11-9-5.3,[12] to the Department of

---

[11]    General Laws 1956 § 40-11-6 provides, in pertinent part:
> "(a) When any physician or duly certified registered nurse practitioner has cause to suspect that a child brought to him or her or coming to him or her for examination, care, or treatment, is an abused or neglected child as defined in this chapter, * * * he or she shall report the incident or cause a report thereof to be made to [DCYF] as provided in subsection (b).
> "(b) An immediate oral report shall be made by telephone or otherwise, to both the department and law enforcement agency, and shall be followed by a report, in writing, to the department and law enforcement agency explaining the extent and nature of the abuse or neglect the child is alleged to have suffered."

[12]    In this case, Moten was found guilty of first degree child abuse under G.L. 1956 § 11-9-5.3(b)(1), which provides, in pertinent part:
> "(b) Whenever a person having care of a child, as defined by § 40-11-2(2) [as 'a person under the age of eighteen (18)'], whether

Children, Youth and Families (DCYF) and law enforcement. Although this Court has not yet had the opportunity to address the interplay between a statutory duty to report and the Confrontation Clause, we need not write on a blank slate. We agree with other jurisdictions that have held that a statutory duty to report does not necessarily render a statement testimonial under the Confrontation Clause. See, e.g., Seely v. State, 282 S.W.3d 778, 788 (Ark. 2008) (holding that a social worker's duty to report child abuse did not, by itself, render the child victim's statements testimonial); State v. Spencer, 169 P.3d 384, 389 (Mont. 2007) (holding that a mandatory reporting statute was not "intended to deputize th[e] litany of professionals and individuals [listed therein] into law enforcement"). The focus should remain on the circumstances surrounding the statement and whether those circumstances objectively indicate that the primary purpose of the statement is to prove events relevant to criminal prosecution. See Melendez-Diaz, 557 U.S. at 310 (citing Crawford, 541 U.S. at 51-52). In so doing, we must turn to the primary purpose of Dr. Harper's consultation with the ophthalmologist. See Bryant, 131 S. Ct. at 1157; see, e.g., State v. Justus, 205 S.W.3d 872, 880 (Mo. 2006) (holding that the primary purpose of an interview was to preserve testimony for a later criminal prosecution, thereby rendering the declarant's statements testimonial; interviewer knew that her interview was "an official interview done for law enforcement" and interviewee was aware that her statements could be used to prosecute the defendant); State v. Blue, 717 N.W.2d 558, 564-65 (N.D. 2006)

---

assumed voluntarily or because of a legal obligation, including any instance where a child has been placed by his or her parents, caretaker, or licensed or governmental child placement agency for care or treatment, knowingly or intentionally:

"(1) Inflicts upon a child serious bodily injury, shall be guilty of first degree child abuse."

Section 11-9-5.3(c) defines "serious bodily injury," to include physical injury that:

"(4) Evidences subdural hematoma, intercranial hemorrhage and/or retinal hemorrhages as signs of 'shaken baby syndrome' and/or 'abusive head trauma.'"

- 24 -

(holding that the declarant's statements during an interview were testimonial because there was no "ongoing emergency" and the primary purpose was undoubtedly to prepare for trial).

In light of Dr. Harper's statutory obligation to contact DCYF—and because evidence of retinal hemorrhages is delineated by the statute as one way to demonstrate serious bodily injury, thus establishing first degree child abuse—it seems clear that Dr. Harper would have anticipated that the information gathered from the ophthalmologist might be used in a subsequent prosecution. See § 11-9-5.3(c)(4) (defining "retinal hemorrhages" as one form of serious bodily injury). It does not necessarily follow, however, that the primary purpose of the ophthalmologist's statements was to provide evidence of criminal conduct rather than to provide medical treatment. See Bryant, 131 S. Ct. at 1157. Moreover, there was no evidence that Dr. Harper contacted the ophthalmologist at the specific request of the police or DCYF.

In our view, the primary purpose of the ophthalmologist's examination was to determine the extent of the injuries to the baby for the purpose of rendering medical treatment. Doctor Harper testified that she was concerned with the baby's retinal bleeding, which could otherwise lead to blindness if left untreated.[13] Indeed, she stated that the attending physician performed another eye examination on the baby the very next morning—as well as on several other occasions in the following weeks and months—because of the concern that retinal hemorrhages could damage the baby's eyesight. Thus, even if it was known or suspected that the

---

[13]  Specifically, Dr. Harper testified that

> "once you have hemorrhages in the eye, it can keep you from seeing well. And if you can't see well, and when you're young and trying to develop your vision, it can cause permanent difficulties with something called amblyopia where you can't focus properly. You look cross-eyed. You may even go blind. So, there are grave concerns once you see these injuries to the back of the eye. You have to follow them closely and to make sure that she sees clearly and to make sure that the baby doesn't need surgery on the eye. It's a concerning point."

ophthalmologist's reports would likely be used in a future criminal trial, the primary function of the report was not to accuse "a targeted individual of engaging in criminal conduct," Williams, 132 S. Ct. at 2242, or to "establish or prove past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822; see also Bryant, 131 S. Ct. at 1154; Melendez-Diaz, 557 U.S. at 310. Rather, the primary purpose of the ophthalmologist's report was to resolve an ongoing medical emergency—to wit, damage to the baby's eye sight and the potential threat of blindness. Because the primary purpose of the ophthalmologist's statements was to resolve that emergency with proper medical treatment, thereby rendering the statements nontestimonial, we would conclude that their admission did not violate the Confrontation Clause.

Although we respectfully disagree with the majority's conclusion that Moten's Confrontation Clause challenge was not novel, and believe that the majority should have reached the merits of this issue, we ultimately conclude—after our own review of the merits—that the majority reached the proper result in affirming the judgment of conviction, because the evidence offered by Dr. Harper was nontestimonial.



**TITLE OF CASE:**         State v. Jeffrey Moten.

**CASE NO:**               No. 2008-51-C.A.
                           (P2/05-1037CR)

**COURT:**                 Supreme Court

**DATE OPINION FILED:**    May 17, 2013

**JUSTICES:**              Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**            Associate Justice William P. Robinson III

**SOURCE OF APPEAL:**      Providence County Family Court

**JUDGE FROM LOWER COURT**:

                           Associate Justice Michael B. Forte

**ATTORNEYS ON APPEAL:**

                           For State:  Jane M. McSoley
                                       Department of Attorney General

                           For Defendant:  Lara E. Montecalvo
                                           Office of the Public Defender