July 2, 2024

|  |  |
|---|---|
| State | : |
| v. | : |
| Dari Garcia. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State              :

v.              :

Dari Garcia.        :

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Robinson, for the Court.** The defendant, Dari Garcia, appeals from a May 3, 2018 judgment of conviction and commitment following a jury trial held in the Superior Court for Providence County. The defendant was charged with fifteen counts pertaining to several related occurrences that took place in the evening of August 17, 2014 at a home in North Providence, Rhode Island. On appeal, the defendant presents nine grounds for reversal of his conviction. He bases his argument for reversal on a wide variety of reasons, which are enumerated and discussed in detail below.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

- 1 -

# I

## Facts and Travel

The various charges against defendant arose out of a most regrettable series of events that led to several tragic consequences, including the death of Richard Catalano. We preliminarily note that it is undisputed that Richard Catalano was shot to death in the evening of August 17, 2014 in a house located at 9 Elliot Avenue in North Providence; and it is further undisputed that Lorie Catalano, Christopher Tamelleo,[1] and Lindsey Onorato were also present in that house on the night of the shooting.[2]

On February 12, 2015, a grand jury indicted defendant on fifteen counts: one count of first-degree murder; three counts of discharging a firearm while committing a crime of violence; one count of conspiracy; one count of burglary; four counts of felony assault (three of which were assault with a dangerous weapon); one count of using a firearm during a crime of violence; one count of carrying a firearm without

---

[1]    Christopher Tamelleo was the husband of Lorie Catalano.

[2]    For the sake of avoiding any confusion, we shall ordinarily refer to Lorie Catalano and Richard Catalano (mother and son) by their full names. All other persons will be referred to in the usual manner.

Lorie Catalano was the mother of the murdered Richard Catalano. We note that the record contains several variations of the spelling of her first name. For the sake of consistency, we have opted to utilize the spelling "Lorie," which is how her name was spelled when she was sworn in as a witness at trial.

a license; one count of possession of a firearm after conviction of a crime of violence; one count of alteration of marks of identification on a firearm; and one count of committing a crime of violence when possessing a stolen firearm.

On November 27, 2017, prior to the start of defendant's jury trial, a hearing was held on pretrial motions—including, *inter alia*, defendant's motion to dismiss, defendant's motion to suppress, and defendant's motion *in limine* to exclude any reference to defendant's gunshot wound as being self-inflicted.  Later that same day, jury selection began.  Thereafter, a trial took place over eight days in November and December of 2017.  On December 12, 2017, the jury, having deliberated, returned a guilty verdict on Counts One, Two, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, and Fifteen.[3]  The defendant subsequently filed a motion for a new trial, and a hearing on that motion was held on January 5, 2018, after which the trial justice denied defendant's motion.  On April 13, 2018, defendant was sentenced as follows: three life sentences—the first two sentences to be served consecutively

---

[3]     As noted *infra*, after the state rested, on December 8, 2017, defendant moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure as to Count Three (charging defendant with conspiracy to commit a robbery), which motion was granted by the trial justice.  Moreover, by stipulation of the parties, the allegations set forth in Count Thirteen were never presented to the jury. (Count Thirteen had charged defendant with possessing a firearm during a crime of violence following a prior conviction of a crime of violence.)

to each other, and the third life sentence to be served concurrently with the other two; five consecutive twenty-year sentences; three concurrent ten-year sentences; one concurrent five-year sentence; and a twenty-five-year consecutive sentence as an habitual offender. The defendant filed a timely, albeit premature, notice of appeal on April 13, 2018.[4]

We relate below the salient aspects of the pretrial hearing, the trial, the motion for a new trial, and the sentencing.

## A

### The Pretrial Motions

On October 3, 2017, defendant filed a motion to suppress his verbal statements made to Rhode Island Deputy Sheriff Ian Banigan, who was guarding defendant while he was undergoing treatment at Rhode Island Hospital as a result of the events of August 17, 2014. In his "Complaining Witness Statement," Sheriff Banigan reported that defendant had asked Sheriff Banigan if he was "f*****," at which point Sheriff Banigan asked defendant what he meant. The defendant then said: "I'm f*****, they have three bodies on me." In his motion to suppress, defendant argued that this inquiry by Sheriff Banigan to defendant as to what his initial question had

---

[4] This Court has consistently "stated that [it] will overlook the premature filing of a notice of appeal." *State v. Sheridan*, 252 A.3d 1236, 1243 n.6 (R.I. 2021) (internal quotation marks and brackets omitted).

- 4 -

meant constituted custodial interrogation. The trial justice, citing *State v. Grayhurst*, 852 A.2d 491 (R.I. 2004), denied defendant's motion to suppress. She emphasized that Sheriff Banigan was not at the hospital in order to interrogate defendant, and she further found that Sheriff Banigan's response "was merely an instinctive reaction provoked by the [d]efendant's initial statement."

In addition, defendant filed a motion to dismiss Count Seven on double jeopardy grounds. In his motion, defendant argued that his "alleged assaultive conduct was part of an unbroken chain of events properly considered a single act, rather than an unrelated series of discrete crimes." He contended that, due to the fact that Count Six and Count Seven charged an identical crime (*viz.*, assault with a dangerous weapon against Lorie Catalano), Count Seven should have been dismissed under double jeopardy principles. Specifically, defendant contended that, even though defendant allegedly shot Lorie Catalano once in her son's bedroom and a second time in a separate room, these two alleged shootings "were part of one continuing event or occurrence * * *." The trial justice did not rule on this motion to dismiss at that time, instead suggesting that defendant later "make a Rule 29 motion on that," and she indicated that she would "rule at that time."

## B

## Jury Selection

Upon the completion of the hearing on the pretrial motions, jury selection began. In the course of the *voir dire* process, Juror 98 indicated that she had a son who was "locked up * * * in Bridgewater"[5] because he had "tried to rob a bank." Juror 98 further stated that the authorities in Massachusetts had treated her son well, and she also stated that both the prosecutors and defense counsel were "all very good with him." When asked by the trial justice if she could be fair in the instant case, Juror 98 answered in the affirmative and additionally confirmed that she could "keep an open mind and consider all the evidence [the parties] offer." The trial justice engaged in further questioning and then asked Juror 98 whether, in this case, she would hold the state to "a higher standard than [beyond a reasonable doubt] because of the nature of the charges * * *?" Juror 98 responded by stating: "That's hard to say." Subsequently, the following exchange occurred:

> "THE COURT: I know. Well, is there anything about you that would prevent you from sitting in judgment against somebody in a case like this?
>
> "[JUROR 98]: I never been in a situation like this. I don't even know what to say.

---

[5] We infer that, in disclosing the location of her son's incarceration, Juror 98 was referring to Old Colony Correctional Center, which is located in Bridgewater, Massachusetts.

> "THE COURT:  No, no.  Are you a person who just can't sit in judgment?
>
> "[JUROR 98]:  I probably can't.
>
> "THE COURT:  I'm not suggesting it to you.  I'm trying to get --
>
> "[JUROR 98]:  I understand what you're saying.
>
> "THE COURT:  You would have to make a decision --
>
> "[JUROR 98]:  That decision, I don't think I can.
>
> "THE COURT: You don't think you can do it?
>
> "[JUROR 98]:  No."

Defense counsel then asked Juror 98: "[I]f you feel the State does prove this case beyond a reasonable doubt, will you be able to follow the Judge's instructions and find him guilty?"  Juror 98 responded: "Yes,  I would.  I would be able to follow the instructions."   The following further questioning then took place between the trial justice and Juror 98:

> "THE COURT: * * * Maybe you suspect he's guilty, but [the state] didn't prove it beyond a reasonable doubt. Could you say 'not guilty'?
>
> "[JUROR 98]: If they didn't prove it, that's hard.
>
> "THE COURT:  That's hard for you?
>
> "[JUROR 98]:  Yeah.
>
> "THE COURT: Why is that?

- 7 -

"[JUROR 98]: I don't know."

The trial justice then posed the following question to Juror 98:

"THE COURT: * * * If the State doesn't prove each and every element of the crime charged beyond a reasonable doubt, even if you suspect the Defendant did it but they didn't prove it, even if it's a strong suspicion, but they didn't prove it beyond a reasonable doubt, in spite of the nature of these charges, could you come back and say 'not guilty'? Can you do that?

"[JUROR 98]: If they didn't prove it?

"THE COURT: Yes.

"* * *

"THE COURT: You're hesitating.

"[JUROR 98]: If I feel they didn't prove it, and I feel he's not guilty, or if I feel he's guilty --

"THE COURT: You might feel he's guilty, but the question is if they didn't prove it. You might feel he's guilty, but you feel they didn't prove it beyond a reasonable doubt. Can you come back and even if you kind of feel he's guilty, but they didn't prove it beyond a reasonable doubt, can you come back and say 'not guilty'? Take your time.

"[JUROR 98]: I can't say that he's guilty if they didn't prove it."

The prosecutor proceeded to ask Juror 98 if she had ever been a victim of a crime, and Juror 98 responded that she had once been "assaulted" while she was

- 8 -

jogging in a park.  When asked if that experience would "hinder [her] ability to be fair and impartial" in the instant case, Juror 98 replied: "I'm sorry.  I can be fair."  Juror 98 added that she did not believe that the perpetrator of the assault on her was ever caught.  She further indicated that she was "satisfied with the job that the police did in that case."

On the next day, the state exercised a peremptory challenge with respect to Juror 98.  Upon the state exercising this peremptory challenge, defense counsel objected on *Batson* grounds,[6] stating that he felt that the state's reason for striking Juror 98 was because "she's a person of color."  Defense counsel proceeded to assert that he felt that Juror 98 had been hesitant about answering certain questions due to how she "understood the language."  Defense counsel pointed out that Juror 98 "made it clear that she would consider what was said and that she would make a decision based on the evidence that if she felt he was guilty, she would vote guilty.  And if she felt not guilty, she would vote not guilty."  Defense counsel asserted that "any attempt to parse her testimony, or to microanalyze her personality, is just an attempt to try to * * * look for a reason to get her off because she's black."

The trial justice interrupted, offering the following commentary:

> "By the way, I do want to point out that [Juror 98's] skin tone is very, very dark.  I just want to say, for the record,

---

[6]      *See Batson v. Kentucky*, 476 U.S. 79 (1986).

the Defendant's skin tone, although he appears to be a person of color, is very light as a person of color. She is not Hispanic. He is Hispanic. I just wanted that on the record, that she is clearly dark-skinned, even for someone who is a person of color. He is very light-skinned for a person of color and Hispanic. I wanted that on the record."

The trial justice stated: "The issue in *Batson* is whether or not she is being excused because of race. That's the only one. She has a right to serve, and the Defendant has a right to have her serve if she is systematically being excluded because of race."

Defense counsel stated that he believed that the questions asked by the state "were a little more probing than some of the other jurors." The colloquy between defense counsel and the trial justice then proceeded as follows:

> "[DEFENSE COUNSEL]: * * * [W]hatever deficiencies there might be in her intellect or communication skills, she has a right to be a juror. Her being a black person, I think, especially to try to find fault with her for those deficiencies, I think is a pretext. Not to insult anybody.
>
> "THE COURT: Well, it is insulting. But that's okay.
>
> "[DEFENSE COUNSEL]: I have the highest respect for them.
>
> "THE COURT: You have a right on behalf of your client to say what you say, but you did insult them. But that's okay.[7]
>
> "[DEFENSE COUNSEL]: Okay. That's what I feel.

---

[7]    It is clear from the context that the trial justice's use of the pronoun "them" referred to the two prosecutors.

"THE COURT: It's your obligation to say what you feel.

"[DEFENSE COUNSEL]: I understand.

"THE COURT: It is insulting, but go ahead."

Following this exchange, the state offered what it considered to be three race-neutral explanations for the peremptory challenge. The first reason pertained to Juror 98's son. The prosecutor stated:

> "[S]he came before the Court, unsolicited, and told us her son is serving time in Massachusetts and has been convicted of a robbery. In this case, there's not a clear robbery claim, but certainly a conspiracy to rob, and the facts that arise to what was at least attempted robbery in this case. So that similarity gives the State concern that she could be fair and impartial especially, you know, possibly even feeling sympathy for the Defendant. She made the comment that her son was a good man, so that left the State with concern."

The state's second reason was a result of Juror 98's confusion regarding the standard of proof:

> "[A]s far as Your Honor's questioning of her as to her understanding the burden of proof, the fact that the State has to prove beyond a reasonable doubt his guilt, but not beyond all doubt, the State was concerned by her multiple times where she hesitated, that she would have a lot of trouble following that instruction as to the burden of proof. You know, as to the fact -- well, that's the second reason."

Finally, the state's third reason related to the fact that Juror 98 stated that she was a victim of a crime:

"[W]hen going into the normal questions, she did say she was the victim of a crime. I'm assuming it was assault. She couldn't even talk about it. I don't know if it was sexual or physical in nature. This is a pretty close case. So the concern from the State that she could sit and listen to all of these facts and come out with a judgment was also a concern."

After the state concluded its proffer of race-neutral explanations, the trial justice noted that Juror 98 "was the only person of color seated."[8] She added that there was a "juror excused for cause, a Hispanic gentleman, who himself asked to be seen at sidebar and advised the [c]ourt that his English communication skills were insufficient to follow the evidence and instructions on the law." Additionally, she stated that there was also an "Asian gentleman," who was hostile and not interested in serving on the jury. As to that juror, the trial justice stated: "It was abundantly clear in an effort to get out of serving he provided the [c]ourt with every reason why he couldn't be fair and impartial." That person was eventually excused.

Turning next to the race-neutral explanations proffered by the state, the trial justice began with the significant statement that it was her view that the state "would have used up a [peremptory] challenge on this woman, had she been white." The

---

[8] It is noteworthy that, later, *after* she had overruled the *Batson* challenge, the trial justice noted for the record that a particular person who was seated on the jury (*viz.*, Juror 38) had a skin tone that was "similar to the Defendant, and he's Hispanic."

trial justice added that, in reaching that conclusion, she had taken into account the fact that Juror 98's son "was picked up, charged with * * * attempting to rob a bank, and must have pled." The trial justice acknowledged that Juror 98 stated that she "would not hold that against anyone, and she was clear, by the way, that she was really able to articulate that she felt he was treated fairly." However, the trial justice further commented: "Nonetheless, she clearly loves her son. She made a point she visits him all the time."

Moving to the second race-neutral explanation, the trial justice emphasized that Juror 98 was "very, very confused" about the "very basic instructions." The trial justice specifically noted that, when Juror 98 was asked the same questions as had been posed by the trial justice to several other jurors, she seemed very confused on the topic of the standard of proof. She did note that Juror 98 was at one point rehabilitated; but she added that Juror 98's body language continued to suggest that she was confused, in that "her body language was such that the time space between her answers and the questions, she looked like it wasn't a question of nervousness." The trial justice emphasized that this body language suggesting confusion was especially apparent when compared with her ability to give answers regarding her son, which the trial justice stated had come "more easily."

Lastly, with respect to the state's third race-neutral explanation, the trial justice stated that, when Juror 98 was indicating that she had been a victim of a crime, she was unable to describe the incident in detail and was very distraught.

The trial justice summed up her reasoning by stating that, based on the prosecutor's explanations, "had [Juror 98] been white, Anglo-Saxon, Protestant, and had a very sophisticated educational background, and even had friends who were police officers, the State would have moved to exclude her." Accordingly, the trial justice overruled defense counsel's *Batson* challenge.

### C

### The Trial

There follows the testimony of those witnesses whose testimony we deem relevant to our resolution of the issues on appeal.

### 1. The Testimony of Officer Ariel Kurpiewski

Officer Ariel Kurpiewski, who responded to a dispatch call to the 9 Elliot Avenue address in North Providence on August 17, 2014, testified that what he first observed upon arriving at the scene was Christopher Tamelleo running toward him while "screaming and yelling." According to Officer Kurpiewski, Mr. Tamelleo informed him that a "black male with a beard entered his house and shot his wife." Officer Kurpiewski stated that he then heard the sound of a gunshot in the backyard. He testified that, after not succeeding in finding anyone in the backyard, he "retreated

back to [the] vehicle to take cover and waited for other officers to arrive." Officer Kurpiewski stated that, when another officer arrived at the scene, he informed him of the gunshot as well as the fact that, when he had passed in front of the residence, he had observed Lorie Catalano lying on the front porch covered in blood. When the two officers made their way to the rear porch, Officer Kurpiewski heard two gunshots go off from inside the house. Officer Kurpiewski testified that, when he entered the house at 9 Elliot Avenue, he observed "pry marks around the doorknob area." He added that he "also observed a pry bar which had an orange handle directly beneath the door on the porch." As the two officers entered the kitchen area, Officer Kurpiewski also noticed blood all over the floors as well as "spent bullet casings on the floors" and a "bullet hole in the ceiling." Officer Kurpiewski further testified that, shortly after he entered the house, Mr. Tamelleo came into the house, "shouting that his son is in the room * * *."

Officer Kurpiewski testified that Mr. Tamelleo then moved outside the house, and the officers entered a bedroom, where they observed Richard Catalano, who appeared to have been shot "with his head down with blood all over his shirt." Because the door to the bedroom would not open fully, Officer Kurpiewski started to push it; and, when he looked behind the door, he observed "a black male with a

- 15 -

beard directly behind the door."  He testified that that person[9] had blood on his face; he added that it appeared that "he had a gunshot wound to the top of his forehead."

## 2. The Testimony of Christopher Tamelleo[10]

The next witness was Christopher Tamelleo, who testified that, on the evening of August 17, 2014, he woke up to the sound of "vicious banging."  Mr. Tamelleo stated that, when he tried to determine who was in the house, he noticed a black male (whom he later identified in his testimony as defendant) standing with a gun pointed toward Richard Catalano's bed.  He testified that he heard defendant fire the gun at Richard Catalano and that defendant then said: "Where is the money?"  Mr. Tamelleo testified that he "went and tackled" defendant, while Lorie Catalano dove over her son's bed toward defendant.  Mr. Tamelleo stated that he witnessed defendant firing another shot into Lorie Catalano's shoulder as she dove over the bed.  According to Mr. Tamelleo, when he tackled defendant, the gun flew across the kitchen floor.  Mr. Tamelleo added that defendant was able to retrieve the gun before he could do so and that defendant put the gun to Mr. Tamelleo's head.  However, Mr. Tamelleo further testified that he was able to place his "finger behind the trigger so it wouldn't engage."

---

[9]     In the course of his testimony, Officer Kurpiewski identified defendant as the person who had been behind the door.

[10]     *See* footnote 1, *supra*.

Mr. Tamelleo also testified that, as he was on top of defendant, Lorie Catalano "came out of the bedroom and jumped on [Mr. Tamelleo's] back because [defendant] was hitting [him] over the head with the gun." He stated that, once he was able to free himself from defendant, he ran outside and called 911; he added that he noticed defendant run out the back door onto the porch, apparently uninjured.

### 3. The Testimony of Lorie Catalano

Lorie Catalano began her testimony by stating that, on the night of August 17, 2014, she was awoken by a "loud bang." She added that, after hearing the loud noise, she went to her son's room and observed that he had been shot. Upon seeing defendant holding a gun and apparently trying to use the weapon again on her son, she "hopped over [the bed] and took the shot, took the bullet * * *." Lorie Catalano testified that, after she was shot in the shoulder, her son said to her: "Mommy, who is he? What does he want? Why did he shoot me?" She said that she replied: "I'm going to clear it. Let me see so I can get you out. I'll be right back."

It was Lorie Catalano's further testimony that she left her son's room and found defendant and Mr. Tamelleo struggling on the floor in the hallway. Lorie Catalano stated that, in an attempt to help Mr. Tamelleo, she hit defendant with a light fixture. She added that she punched defendant with her left hand and that her "finger slipped into his mouth and he chewed it * * * off completely." Lorie Catalano further testified that she and defendant continued to struggle over the gun

- 17 -

and that defendant "grabbed it first." She testified that, once defendant had the gun, he said: "You f****** bitch whore. You're a ghost." She testified that defendant then proceeded to shoot her in the face.

### 4. The Testimony of Lindsey Onorato

Lindsey Onorato testified that in 2014 she was living with Richard Catalano, her boyfriend, at the 9 Elliot Avenue house in North Providence, where Mr. Tamelleo and Lorie Catalano also resided. She stated that, on August 17, 2014, she had slept all day because she was feeling ill; she added that Richard Catalano had been attending a "shoe convention" in Providence. Ms. Onorato testified that, at approximately 11:45 p.m., she heard a loud bang and then saw a man with a gun enter the house. According to Ms. Onorato, the man, whom she identified at trial as defendant, walked into the bedroom, asked Richard Catalano where the money was, and shot him. Ms. Onorato stated that, upon seeing that Richard Catalano was shot, she called 911. She testified that she then grabbed her dogs, ran out of the house, and called 911 again.

During cross-examination, defense counsel sought to inquire about the possible presence of drugs in the Elliot Avenue house. At sidebar, after a rather lengthy colloquy with the trial justice as to whether evidence of the existence of drugs (other than marijuana) in the house could be introduced, the trial justice asked defense counsel: "So what Rule of Evidence do you ask her about, about using

- 18 -

heroin?  Are you going to be saying, well, was she under the influence so her impressions aren't good?"  Defense counsel answered in the affirmative.  At that point, the trial justice excused the jury and sought to determine if Ms. Onorato had been "under the influence at that point in time."

Outside the presence of the jury, defense counsel asked Ms. Onorato if she had used any illegal drugs on August 17.  Ms. Onorato responded that she had snorted heroin earlier that day; she specified that she had done so before Richard Catalano left to go to the shoe convention at approximately 2:00 p.m.  When asked by defense counsel what effect the heroin had on her at approximately 11:45 p.m., Ms. Onorato stated that she had been fine as of that time and that she felt as though the heroin had had no effect on her.  The trial justice ruled:

> "Absent evidence, and I mean expert evidence, that snorting heroin, for a person who she said used heroin early in the day would have an impact on her ability to perceive at 11:45 at night, the evidence is excluded.  The objection is sustained.  Your exception is noted.  Your offer of proof will be your *voir dire*."

### 5. The Testimony of Sheriff Ian Banigan

Sheriff Ian Banigan was also called upon to testify.  He testified that, on September 1, 2014, he had been on "guard detail" of defendant, who was being treated at Rhode Island Hospital for a gunshot wound.  The prosecutor asked Sheriff Banigan if defendant had said anything to him when he was in the hospital room

with him.  Defense counsel stated that he would be objecting "for the reasons specified in [his] prior motion."  The trial justice responded: "[O]verruled for the reasons I gave previously."

Sheriff Banigan testified that defendant asked him if he was "f*****."  Sheriff Banigan testified that he reacted by asking defendant what he meant.  According to Sheriff Banigan, defendant then stated: "I'm f*****.  They got three bodies on me."  Sheriff Banigan testified that he believed that he then told defendant, "I don't know" in response to what defendant had said.  He also stated that he and defendant did not exchange any further words during the rest of the day.

### 6. The Three Hernandez Brothers[11]

Victor Hernandez was next called as a witness by the prosecution.  The state began by asking Victor with whom he had gone to 9 Elliot Avenue on August 17, 2014.  Victor replied that he could not "answer that question."  Victor acknowledged that he had "no Fifth Amendment right whatsoever because [he had] already pled and [had] been sentenced," and he confirmed that he had no legal or physical basis for declining to answer the question.  After Victor refused to answer the state's question for a second time, the trial justice informed Victor about what would occur

---

[11]     For the sake of clarity, we refer to the members of the Hernandez family by their first names.  No disrespect is intended.

if she were to find him in contempt of court, and she gave him a final opportunity to answer the question. Victor again refused to answer the question. As a result, the trial justice found him in contempt of court and sentenced him to ten years at the Adult Correctional Institutions (ACI), to be served consecutively to the sentence which he was then serving.

After Victor was excused by the trial justice, a man who later identified himself as Carlos Hernandez spoke out in open court, saying: "Love you, brother." The trial justice proceeded to find Carlos in contempt "to vindicate the authority of the Court," and she sentenced him to 48 hours at the ACI.

Viclei Hernandez was also called to testify by the state. In response to the prosecutor's question as to whether he had given defendant a ride to 9 Elliot Avenue on August 17, 2014, Viclei stated that he did not remember. The trial justice ordered that he be given a transcript of his plea for the purpose of refreshing his recollection. When then asked if his recollection was refreshed, Viclei stated that his previous statement at the time of his plea was false, that he lied about everything contained in his previous statement, and that he could not remember what happened on the day in question. The trial justice emphasized that, because Viclei had pled guilty, he had no Fifth Amendment right against self-incrimination with respect to the question he had been asked. In view of Viclei's responses, the trial justice found him to be in contempt of court, and she sentenced him to ten years at the ACI, to be served

- 21 -

consecutively to the sentence that was yet to be imposed on him in connection with what took place at 9 Elliot Avenue on August 17, 2014.

### 7. The Testimony of Neil Clapperton

The state next called Neil Clapperton, a "Criminalist II" at the State of Rhode Island Crime Laboratory. Mr. Clapperton explained that the responsibilities of a Criminalist II include "the examination of firearms and doing all the analyses pertaining to firearms and ammunition, which would include test fires, identification of cartridge cases and projectiles to a particular weapon, tests for operability and functionality of the firearm, serial number restoration, distance determination, [and] pellet pattern." Mr. Clapperton provided testimony as to the definitions of certain terms such as a firearm, a semiautomatic pistol, and the various components of a cartridge, among others.

With respect to the instant case, Mr. Clapperton testified that the Crime Laboratory had received "a firearm with a magazine, a live cartridge, three projectiles, and five cartridge cases." He added that there was a second submission of materials, consisting of two cartridge cases. Several exhibits, which were identified by Mr. Clapperton as discharged cartridge casings retrieved from the scene, were introduced into evidence as full exhibits. Shortly thereafter, the following colloquy occurred:

"[PROSECUTOR]: Mr. Clapperton, in your expert opinion to a reasonable degree of scientific certainty, is it your opinion that items l0, 11, 12, l3 --

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Sustained. Leading. Wrong form. If you have any questions about the form, confer with counsel, because I don't want you to keep doing it.

"* * *

"[PROSECUTOR]: Based upon your examinations of the cartridge casings, did you form an opinion?

"[WITNESS]: Yes, sir.

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Sustained. Stricken. Did you form an opinion on what?

"[PROSECUTOR]: Did you form an opinion that the casings were fired from the firearm --

"[DEFENSE COUNSEL]: Objection.

"THE COURT: Sustained. Ladies and gentlemen, I'm going to send you upstairs. Okay. Put your pads down. I'm not going to have a bunch of improper questions asked, because after a while it's the question that becomes the evidence."

The trial justice further stated:

"THE COURT: Please read [Rules] 703, 705. And if you need to confer with somebody, confer. But I'm not going to allow this to continue unless you have it right. And when you have it right, let me know.

- 23 -

"* * *

"THE COURT: Do you have the rules of evidence on your table?

"[PROSECUTOR]: Yes, I do.

"THE COURT: Good.

"* * *

"[PROSECUTOR]: The State is ready, Your Honor. I apologize.

"THE COURT: Why don't you come off the record to sidebar, and let me find out how you're going to phrase it, because you end up testifying otherwise."

### 8. The Defendant's Motion for Judgment of Acquittal

At the close of the prosecution's case, defense counsel moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. Before arguments on the motion began, the trial justice confirmed that the state was not objecting to dismissal of the conspiracy count (Count Three), and she subsequently dismissed that count.

Defense counsel then advanced arguments as to why the Rule 29 motion should be granted as to various counts, including Count Five.

Defense counsel contended that defendant was being charged twice for the same crime—*viz.*, Count Five, which charged defendant with "discharging a firearm

- 24 -

while committing a crime of violence * * * [t]o wit, burglary resulting in the death of Richard Catalano," and Count Two, which charged defendant with "discharging a firearm while committing a crime of violence, to wit, murder, resulting from the death of Richard Catalano."

The state responded that, because "the felony murder, which the State is putting forth as its theory under the murder count, would be with the intent to commit an attempted robbery, not a burglary," the counts were "not duplicative in the sense that the murder and the burglary are not of the same theory as far as the felony." Deferring her ruling on the issue, the trial justice directed the parties to brief the issue by the end of the day. However, because it had not been determined as of that point in time whether the defense intended to put on evidence or whether defendant would testify, the trial justice decided that she was going to "deny the motion, but [she would] reconsider it in the event that" defendant presented "any evidence."

Thereafter, the trial justice found that, at that stage in the proceedings, Counts Five and Two were separate counts; but she indicated that she would "address the issue again in the event the Defendant is convicted of more than one of those counts that are the subject matter of [the Rule 29] motion," in that she would "review it for purposes of sentencing to make sure sentencing is not duplicative."

## 9. The Closing Arguments, the Jury Instructions, the Verdict, and the Motion for a New Trial

After defendant rested, but before closing arguments began, the trial justice reminded the jury that "what an attorney says during his or her final argument is not evidence" and that such statements were not to be considered in the same way in which the jury should consider "the testimony or the exhibits or the stipulations." The trial justice further noted an issue pertaining to the state's intention to argue to the jurors that they could infer that defendant's gunshot wound was self-inflicted, to which defense counsel objected.[12] The trial justice emphasized that she was not going to allow the prosecution to "suggest that the jury infer that it was self-inflicted * * *," but she noted that it was a "legitimate argument to make sure the jury isn't confused into thinking somebody else in that house * * * shot him." The trial justice stated that she would allow the prosecution to say only that there was no evidence that anyone in the house shot defendant. However, the trial justice did make clear that, if defense counsel wanted to suggest in his closing "even subtly that [Mr. Tamelleo] fired that weapon and caused the injuries to [defendant]," then she would

---

[12]     This issue first arose on October 3, 2017, when defense counsel filed a motion *in limine* to "preclude references to defendant's wounds as being self-inflicted." At the hearing on the pretrial motions, defense counsel indicated that the state had agreed that it had "no medical evidence to this effect and [it] will introduce no such evidence to this effect." The state confirmed that this assertion was correct.

reverse her ruling and allow the state to suggest defendant's wounds were self-inflicted.

In the course of his closing argument, defense counsel twice commented, among other statements, that there was evidence of Mr. Tamelleo's DNA on the trigger. Defense counsel stated that, "based on the testimony of the witnesses, it seem[ed] likely that his finger was on the trigger and not behind it * * *."

During her closing argument, the prosecutor stated that, unlike what defense counsel mentioned in the course of his closing argument, the jury's task was *not* to determine who caused defendant's injuries; rather, they were to be concerned with who killed Richard Catalano and who caused injuries to Lorie Catalano and Mr. Tamelleo. The prosecutor went on to note that the doors to the Elliot Avenue house were barricaded, and that there were "only two people inside. One is Richard Catalano who, unfortunately, we know from the testimony that he was already deceased at that time, and the other person, Dari Garcia. There was only one person left that could have pulled that trigger." At this point, defendant objected, and the objection was overruled.

Later, during the state's closing argument, the prosecutor stated:

> "[L]et's not forget Lorie Catalano because she will never, never forget. After 67 surgeries, she has survived the most horrific night of her life. Every day she's going to look in the mirror, she looks in the mirror, and she sees that night. She remembers that night. When she looks at her face, her

- 27 -

finger, and the scar still left on her shoulder, the restricted movement, she's always going to remember that night. And those physical injuries not only serve as a reminder of what happened to her, but they serve --"

At that point, defense counsel objected, and the trial justice instructed the prosecutor to "[m]ove on." Once the state concluded its closing argument and the jury was removed from the courtroom, the trial justice, addressing counsel, stated:

"I overruled the objection, because, number one, I instructed them and will be instructing them that final argument is not evidence and also because, as I indicated to you before, Counsel for the Defendant began his final argument. If the door was opened, I would allow Counsel for the State to get into the issue of [defendant's] bullet wounds, and Counsel for the Defendant chose to focus some of his attention on the DNA of Christopher Tamelleo on that firearm and so forth and did certainly infer that Christopher Tamelleo's finger on that trigger * * * was for reasons other than self-protection or might have been. In any event, the door got opened, and I did allow it, and the jury will be instructed that what an attorney says during his or her final argument is not evidence."

As part of her instructions to the jury, the trial justice emphasized that "[r]emarks or statements made by counsel in your presence during the course of the trial or in argument are not evidence and should not be considered as such by you during the course of your deliberations."

After deliberations, the jury found defendant guilty of all the remaining counts of the indictment: Counts One, Two, Four, Five, Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, and Fifteen. On December 19, 2017, defendant filed a

- 28 -

motion for a new trial; and, after a hearing on that motion, the trial justice denied it on January 5, 2018.

## D

### The Sentencing and the Subsequent Travel of the Case

On April 13, 2018, during argument from counsel with respect to sentencing, defense counsel argued that the consecutive life sentence on Count Five was "double jeopardy duplicative of Count [Two] which is discharging a firearm during the commission of a violent crime, which is murder." The trial justice stated that she intended to decline to sentence defendant on Count Five because it was "duplicative of the sentence in Count [Two]." She added that she intended to decline to sentence defendant on Count Eleven because it "appeared duplicative of the sentence" which she intended to impose with respect to Count Ten.

Additionally, defense counsel asked that, if the trial justice were to determine that defendant should receive an additional sentence as an habitual offender, she not "impose a [twenty-five-year] consecutive sentence without parole." He further averred that defendant did not "deserve to have the possibility of parole completely foreclosed at [that] point." Specifically, defense counsel asserted that, while the sentences were "compelling," this was "not a case where the Defendant was convicted of a life without parole charge" and that, therefore, consideration should "be given of rehabilitation, of what the Parole Board can do in the future * * *." He

- 29 -

concluded by arguing that, because defendant had "not been convicted of life without parole," the sentence should not be one of "*de facto* life without parole."

The trial justice subsequently sentenced defendant to three life sentences—the first two sentences to be served consecutively to each other, and the third life sentence to be served concurrently with the other two; five consecutive twenty-year sentences; three concurrent ten-year sentences; one concurrent five-year sentence; and a twenty-five-year consecutive sentence as an habitual offender. The trial justice did not sentence defendant on Count Five, stating that it was duplicative of the sentence on Count Two. Similarly, she declined to sentence defendant on Count Eleven, finding that it was duplicative of Count Ten.

A judgment of conviction entered on May 3, 2018. The defendant filed a premature but valid notice of appeal on April 13, 2018.

**II**

**Issues on Appeal**

The issues raised before this Court by defendant are: (1) whether the trial justice erred in allowing the state to strike a prospective juror in violation of the principles established in *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) whether the trial justice impermissibly allowed into evidence certain testimony by Sheriff Banigan; (3) whether the trial justice erred in limiting the cross-examination of Lindsey Onorato and excluding evidence of her drug use; (4) whether the trial justice

erred in allowing two brothers to testify in the presence of the jury even though she subsequently found both of them and a third brother in contempt of court; (5) whether the trial justice "impermissibly aided the prosecution" during the questioning of an expert witness; (6) whether Count Two and Count Five of the indictment merged for double jeopardy purposes; (7) whether defendant's convictions on Count Six and Count Seven violated the double jeopardy clause; (8) whether certain statements made by the prosecutor in her closing argument were unduly prejudicial; and (9) whether the trial justice's sentencing of defendant resulted in a "*de facto* life without parole sentence without the necessary statutory protections."

We shall address defendant's contentions *seriatim*.

## III

## Analysis

## A

## The *Batson* Challenge

The defendant's first argument is that the trial justice erred "in allowing the [s]tate to strike a prospective minority juror" in purported violation of the principles established in *Batson v. Kentucky*, 476 U.S. 79 (1986). Specifically, defendant contends that it was clear error for the trial justice, when reviewing the questioning of Juror 98, to have concluded: (1) that "the prospective juror had been confused,"

and (2) that, even if she had been white, "the State would have moved to exclude her." The defendant in effect asserts that the trial justice erred in determining that the state proffered sufficient race-neutral reasons in response to defendant's *Batson* challenge. The defendant further argues: "Emphatically, the real concern is why [Juror 98] was the only person of color in the jury pool, excepting a Hispanic male and an Asian male who were both excluded for cause." The defendant additionally emphasizes that the prosecution engaged in a line of questioning that was posed to no other potential juror; he contends that the prosecution "engaged more deferentially" in its interaction with other jurors.

For its part, the state argues that the trial justice correctly denied defendant's *Batson* challenge. The state emphasizes that it provided three race-neutral reasons for the challenge to Juror 98, and it asserts that those reasons were "clearly supported" by the record.

This Court has held that, "[b]ecause of the nature of the inquiry in a *Batson* analysis, a trial justice's decision is accorded great deference." *State v. Gallop*, 89 A.3d 795, 804 (R.I. 2014) (internal quotation marks omitted). For this reason, "the ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous." *Id.* (internal quotation marks omitted).

It has been established that the "Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees the defendant that the State

will not exclude members of [a defendant's] race from the jury venire on account of race." *State v. Pona*, 66 A.3d 454, 472 (R.I. 2013) (internal quotation marks and brackets omitted) (*Pona II*); *see also Batson*, 476 U.S. at 86; *Sanchez v. Roden*, 753 F.3d 279, 284 (1st Cir. 2014).

In *Batson v. Kentucky*, the United States Supreme Court set forth a tripartite test to ascertain whether a defendant has been deprived of the constitutional guarantee afforded by the Equal Protection Clause by virtue of a prosecutor wrongfully exercising a peremptory challenge. *Batson*, 476 U.S. at 96-98.

The first step in the *Batson* tripartite test requires that a "defendant must establish a *prima facie* case of purposeful discrimination." *Pona II*, 66 A.3d at 472 (internal quotation marks and brackets omitted). However, this first prong becomes moot "if the trial justice moves beyond it to consider the second and third steps." *Gallop*, 89 A.3d at 805. If such a *prima facie* case of purposeful discrimination has been established, then the "burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror." *Pona II*, 66 A.3d at 472 (quoting *State v. Price*, 706 A.2d 929, 935 (R.I. 1998)).

Under the second step, it becomes the duty of the prosecutor to "give a clear and reasonably specific explanation of his [or her] legitimate reasons for exercising the challenge." *Miller-El v. Dretke*, 545 U.S. 231, 239 (2005) (*Miller-El II*) (quoting *Batson*, 476 U.S. at 98) (brackets omitted); *see also Pona II*, 66 A.3d at 472 ("Upon

such a showing [of purposeful discrimination], the burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror.") (quoting *Price*, 706 A.2d at 935). In order to satisfy the burden, the prosecutor cannot simply deny that he or she had a discriminatory motive or simply assert that he or she acted in good faith in carrying out the peremptory strike. *See State v. Pona*, 926 A.2d 592, 602 (R.I. 2007) (*Pona I*). However, at this stage, a prosecutor's race-neutral explanation "need not rise to the level justifying exercise of a challenge for cause." *Batson*, 476 U.S. at 97. It is also noteworthy that this Court has made clear that "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Pona I*, 926 A.2d at 602 (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991)).

Finally, at the third step, the trial justice is required "to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination." *Pona II*, 66 A.3d at 472 (quoting *Price*, 706 A.2d at 935). If the prosecution presents a race-neutral basis for the peremptory challenge, "a trial justice must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Pona I*, 926 A.2d at 602 (internal quotation marks omitted). On that point, we have noted that "[t]here will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Pona I*, 926 A.2d at 602 (quoting *Hernandez*, 500 U.S. at 365).

As part of the third step, a trial justice must conduct a probing inquiry into the proffered race-neutral reason(s) and assess the veracity and credibility of the prosecutor's reasons. *See Pona I*, 926 A.2d at 602 ("[A] trial justice's finding of purposeful discrimination at this third step largely will turn on evaluation of credibility * * *.") (internal quotation marks omitted). As the Supreme Court has stated, "[c]redibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*). The Supreme Court has further stated that, "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Miller-El II,* 545 U.S. at 241. This Court has added that "[t]he trial justice's evaluation of the prosecutor's state of mind is accorded great deference." *Price*, 706 A.2d at 935; *see also Flowers v. Mississippi*, 588 U.S. 284, 303 (2019) (noting that, because a trial justice's findings in the *Batson* context "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference") (quoting *Batson*, 476 U.S. at 98 n.21).

We begin our analysis by stating that, in this case, we are satisfied that an extensive discussion of the first step of the *Batson* tripartite inquiry is not necessary.

A thorough review of the record reveals that the trial justice, without any extended discussion, moved quite quickly beyond the first prong to address and rule on the proffered race-neutral reasons. Accordingly, the question of whether defendant established a *prima facie* case of purposeful discrimination is not actually before us. *See Gallop*, 89 A.3d at 805. Moreover, this Court is convinced that the prosecutor's three articulated reasons for the challenge of Juror 98 were facially race-neutral, and there has been no argument from defendant arguing to the contrary; the second prong of the *Batson* tripartite inquiry has therefore been satisfied. Consequently, we are concerned only with defendant's arguments as they relate to the trial justice's reasoning in her analysis of the third prong of the *Batson* tripartite inquiry (i.e., whether the trial justice properly concluded that the race-neutral reasons for the peremptory strike did not amount to purposeful discrimination).

The defendant has advanced several arguments with respect to the trial justice's rejection of the *Batson* challenge. First, defendant contends that the state engaged in more probing questioning of Juror 98 than of any other juror. Specifically, defendant points to an open-ended question asked by the prosecutor and what he characterizes as a "lengthy interrogation" by the trial justice and the prosecutor on the issue of the standard of proof.

It is evident from the record that a lengthy colloquy occurred between Juror 98 and the trial justice. However, when viewing the exchange between Juror 98 and

the trial justice, it becomes evident why the trial justice found that the nature of Juror 98's responses required her to engage in further probing. After Juror 98 expressed concerns regarding sitting in judgment of defendant and applying the beyond a reasonable doubt standard, it was incumbent upon the trial justice and counsel to conduct further inquiry into the suitability of that juror. While the questioning of Juror 98 may have differed in some respects from the questioning of other jurors and while said juror may have been asked different or more questions from those that were posed to other jurors, a trial justice should consider whether a juror's race-neutral answer to a race-neutral question was the basis for the disparate treatment.

We first take note of the fact that, when the trial justice initially inquired if Juror 98 could be fair in this case, she answered in the affirmative and additionally stated that she could "keep an open mind and consider all the evidence [the parties] offer." However, when the trial justice proceeded to ask Juror 98 if she would hold the state to "a higher standard than [the beyond a reasonable doubt standard] because of the nature of the charges," Juror 98 responded by stating: "That's hard to say." This undoubtedly candid but nonetheless problematic hesitation by Juror 98 understandably alerted the trial justice to the existence of potential confusion on the part of Juror 98; and in our view, further questioning was quite clearly called for.

Following the initial colloquy between the trial justice and Juror 98, defense counsel asked Juror 98: "[I]f you feel the State does prove this case beyond a reasonable doubt, will you be able to follow the Judge's instructions and find him guilty?" Juror 98 responded: "Yes, I would. I would be able to follow the instructions." Nevertheless, the record clearly reflects the trial justice's quite understandable continuing concerns. Juror 98's confusion is reflected in the record once again when the trial justice asked her whether she would be able to return a verdict of not guilty if the state did not prove that defendant was guilty beyond a reasonable doubt. Juror 98 responded: "If they didn't prove it, that's hard." Further questioning took place, and the trial justice noted on the record to Juror 98: "You're hesitating."

It is clear to this Court that, in view of some of Juror 98's responses up to that point, the trial justice was left with no alternative but to further question Juror 98 on her understanding of and willingness to abide by the crucially important standard of proof in this criminal case. In conducting her *Batson* analysis, the trial justice stated that questioning by her as to the standard of proof was routine in the jury selection process. She added that it was the nature of some of Juror 98's potentially troubling answers that called for further probing.

Importantly, the trial justice stated that she was attempting to rehabilitate Juror 98, which comment signals to us that the additional questioning was not racially

motivated; rather it was done in an effort to assist Juror 98. Although the trial justice stated that, at one point Juror 98 was rehabilitated, the trial justice further made clear that Juror 98's body language continued to suggest that she was confused. We are acutely aware that the trial justice was in a position to observe first-hand Juror 98's perceptible confusion and hesitation, to which observations we accord great deference, and it is noteworthy that the trial justice distinguished Juror 98's body language when answering questions pertaining to the standard of proof from her body language when answering questions about her son, which appeared to reflect her being more at ease. We further believe that the perplexed nature of Juror 98's answers to the additional questions posed by the trial justice after their initial colloquy on the issue of the standard of proof clearly supports the trial justice's determination that Juror 98 was still confused.

We likewise perceive no error in the trial justice's determination that the state's third race-neutral reason was sufficient.[13] The trial justice emphasized that

---

[13] Although it is not entirely clear from the record that the trial justice passed with specificity on the first proffered race-neutral explanation (*viz.*, the incarceration of Juror 98's son), there is nothing in the trial justice's discussion to suggest that she found the explanation to be insufficient. *Cf. State v. Austin*, 642 A.2d 673, 678 (R.I. 1994) ("[T]he trial judge reasonably found that the prosecutor exercised a peremptory challenge because the prospective juror's son was incarcerated at the ACI on a robbery conviction. Although the trial justice found that this relationship was an insufficient reason to excuse the juror for cause, it is certainly sufficient to verify its race-neutral character.").

Juror 98 indicated that she had been the victim of an assault. According to the trial justice, she was unable to articulate facts relating to the incident and she became very distraught when discussing the matter. The defendant has offered no convincing reason to disturb the trial justice's appraisal of this reason relied upon by the prosecutor. *See Pona II*, 66 A.3d at 473 (stating that the prosecutor's reason was not "facially implausible or unpersuasive so as to compel a finding that it was pretextual").

The defendant's next claim of error relates to the trial justice's establishing as a "metric whether the State would have expended a [peremptory] challenge were the Juror [an] Anglo-Saxon, Protestant, and had a very sophisticated educational background, and even had friends who were police officers * * *." While it may be true that this Court has never clearly indicated that the trial court should employ that particular criterion, we nevertheless have stated: "[I]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Pona I*, 926 A.2d at 603 (quoting *Miller-El II*, 545 U.S. at 241). To that end, we have added that:

> "[A] trial justice should consider all the evidence
> presented both in support of and in contravention to a
> purported race-neutral reason and should search beyond
> the face of a proffered justification to ensure that, as
> applied to the facts of the particular case and with due

> regard to a comparison of stricken minority venire members to those nonminority members allowed to serve, a peremptory challenge was not, in fact, racially motivated." *Pona I*, 926 A.2d at 610.

In our opinion, the trial justice did not err in considering the proffered race-neutral reasons by the state by virtue of her use of the above-mentioned "metric." While the trial justice's actual language did not directly align with what we articulated in *Pona I*, it is nevertheless our view that the trial justice sought to determine whether the state's race-neutral explanations were racially motivated and did so by ascertaining whether the state would have moved to exclude Juror 98 had she been a nonminority member of the jury pool.

The defendant next calls into question the trial justice's arguably inappropriate observation that Juror 98's "skin tone is very, very dark," while she added that defendant's skin tone is "very light as a person of color." It is not entirely clear to this Court just why the trial justice made this particular observation on the record. Perhaps it was for the reason suggested by defendant in his brief submitted to this Court: "It is not impossible to say the notation was to rebut any notion that race was a factor in as much as the noted difference between the two individuals, the Juror and the Defendant regarding skin tone." Additionally, our review of the record reveals that, in another instance, the trial justice made clear for the record that a different prospective juror's skin tone was "similar to the Defendant, and he's

Hispanic." As previously stated, we are unable to readily discern the trial justice's rationale for so stating in either instance. However, it is clear to us, after carefully scrutinizing the entire record, that this observation in no way impacted her *Batson* analysis.

Finally, defendant also directs this Court's attention to the trial justice's labeling defense counsel's *Batson*-based challenge to the prosecutor's peremptory challenge as "insulting"—something that happened outside the hearing of the jury. While we do not endorse the trial justice's negative commentary on defendant's exercise of his constitutional right as explained in *Batson*, we certainly do not deem this to be reversible error. After reviewing the trial justice's careful and meticulous *Batson* assessment, we are persuaded that this unnecessary remark did not affect her thorough reasoning and corresponding ruling.

For the several reasons set forth above, we affirm the trial justice's denial of defendant's *Batson* challenge.

### B

**The Motion to Suppress the Statements Made to Sheriff Ian Banigan**

The defendant next argues that the statements[14] made by him to Sheriff Banigan while he was being guarded at Rhode Island Hospital and before he was

---

[14] *See* Part I.A, *supra*.

- 42 -

read his *Miranda* rights[15] should have been suppressed as the product of "custodial interrogation." The defendant asserts that he was in "precarious physical shape, drugged, handcuffed to a hospital bed, and the sheriff should have known his statement was likely to elicit an incriminating response." The state contends that defendant was not subjected to custodial interrogation at the time the statements were made. Alternatively, the state argues that any error in admitting defendant's statements would be harmless.

We have held that, "when reviewing a trial justice's decision granting or denying a motion to suppress, we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Depina*, 245 A.3d 1222, 1226 (R.I. 2021) (brackets omitted) (quoting *State v. Storey*, 8 A.3d 454, 459-60 (R.I. 2010)). However, that is not the end of the process; even while remaining deferential to those factual findings, it is our role as an appellate court to "conduct a *de novo* review of the record and independently consider whether a defendant's rights have been violated." *Id.* (quoting *State v. Parra*, 941 A.2d 799, 803 (R.I. 2007)). In performing this independent examination, we "must view the evidence in the record in the light most favorable to the state." *Id.* (quoting *State v. Gonzalez*, 136 A.3d 1131, 1145 (R.I. 2016)). We will reverse "a trial justice's findings on a motion to suppress only

---

[15] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

if (1) his or her findings * * * reveal clear error, and (2) our independent review of the conclusions drawn from the historical facts establishes that the defendant's federal constitutional rights were denied." *Gonzalez*, 136 A.3d at 1145 (internal quotation marks omitted).

After our *de novo* review of the record, it is our conclusion that, based on the undisputed facts and the pertinent case law, defendant has failed to convince us that he was under custodial interrogation when he made his statements to Sheriff Banigan. In *State v. Grayhurst*, 852 A.2d 491 (R.I. 2004), this Court dealt with a similar issue. In that case, the defendant argued that the trial justice improperly denied his motion to suppress statements that the defendant made to a police detective who met with him at the Adult Correctional Institutions for the purpose of inquiring about allegations lodged against the defendant concerning threats "made to public officials as well as violations of no-contact orders." *Grayhurst*, 852 A.2d at 513. After the detective informed the defendant of the allegations, he asked him to read and sign a *Miranda* rights form. *Id.* In response, the defendant "became highly agitated after learning of the charges against him, [and] said 'something to the effect that his wife knows what's coming.'" *Id.* (brackets omitted). The detective responded: "[W]hat do you mean?," to which the defendant answered: "I'm going to put a bullet in her head." *Id.*

In affirming the denial of the defendant's motion to suppress those statements, this Court noted that the defendant's "first statement to [the detective], which was that Ms. Grayhurst knew what was coming, was a spontaneous statement, spoken before [the detective] addressed any questions to him." *Grayhurst*, 852 A.2d at 513. The Court concluded that the statement was thus "not the product of interrogation." *Id.* Similarly, after ruling that the defendant was "estopped from asserting his right to *Miranda's* protection" as it pertained to the second statement because he had waived his right to be informed, this Court noted that, even if the defendant had not been estopped from asserting his rights, he had not been subjected to custodial interrogation. *Id.* at 514. This Court added that the detective's question "[W]hat do you mean?" did not rise to the level of interrogation because it was "merely an instinctive reaction, provoked by [the] defendant's initial statement that his wife knew what was coming." *Id.* We emphasized that interrogation "consists of both direct questioning and of words or actions that the police should know are reasonably likely to elicit an incriminating response." *Id.* (internal quotation marks omitted).

We are of the opinion that an almost identical analysis can be applied to the facts of the case at bar. First, the trial justice, in ruling on the motion to suppress, correctly noted that Sheriff Banigan "was charged with the responsibility of guarding [defendant] when he was in the hospital." In other words, he was not directly involved with the criminal investigation that was ongoing at that time, and

- 45 -

his reason for being there was for non-interrogation purposes. Secondly, it was defendant who initiated conversation with Sheriff Banigan when he, of his own volition, asked Sheriff Banigan if he was "f*****." This, just as we emphasized in *Grayhurst*, 852 A.2d at 514, was a spontaneous question posed before Sheriff Banigan asked defendant anything—and, as such, it was not the product of interrogation.

Additionally, just as the detective in the *Grayhurst* case asked the defendant "[W]hat do you mean?" after the defendant made an unprovoked statement, in the instant case Sheriff Banigan simply reacted to defendant's query and rather unclear statement by asking him what he meant. *Grayhurst*, 852 A.2d at 513. And just as we determined in *Grayhurst*, 852 A.2d at 514, that the response constituted an instinctive reaction to the question posed, we hold that the same reasoning applies here in that Sheriff Banigan's question amounted to a natural response to a spontaneous question asked by defendant. By the same token, defendant's answer to Sheriff Banigan's question—"I'm f*****, they got three bodies on me"—was not the product of custodial interrogation. It cannot be said that Sheriff Banigan's question as to what defendant meant was of a probing or inquisitorial nature or that he should have known that there was a reasonable likelihood of it eliciting an incriminating response. *See Grayhurst*, 852 A.2d at 514. Accordingly, we perceive

no error in the trial justice's denial of defendant's motion to suppress his statements to Sheriff Banigan.

C

## The Limitation on the Cross-Examination of Lindsey Onorato

The defendant contends that the trial justice improperly excluded impeachment evidence in the form of Ms. Onorato's heroin use on August 17, 2014, the day when the events in this case occurred. He further argues that the exclusion of this evidence "impeded the [defendant's] right to confront [the] witness and denied the jury from facts that could have changed their belief of her credibility." Specifically, he states that he "could not assert his full right to confront the witness in violation of his [Sixth] Amendment rights * * *."

The state sets forth multiple arguments as to why defendant's contention in this regard is meritless. First, the state asserts that defendant did not preserve this issue for appeal because no Confrontation Clause argument was raised at trial. Second, the state avers that there is "no substantive merit to [defendant's] Confrontation Clause claim." Lastly, the state contends that "any error in precluding" defendant from questioning Ms. Onorato "about her heroin use would be harmless."

This Court has held that "[t]he ability of a defendant to meaningfully cross-examine the state's witnesses is an essential element of the due process guarantees

of the United States and Rhode Island constitutions." *State v. Lomba*, 37 A.3d 615, 621 (R.I. 2012) (internal quotation marks omitted). In order for "cross-examination to satisfy constitutional guarantees, the trial justice is required to afford the accused reasonable latitude to establish or reveal bias, prejudice, or ulterior motives as they may relate to the case being tried." *State v. Bustamante*, 756 A.2d 758, 765 (R.I. 2000) (internal quotation marks omitted). However, a defendant's right to cross-examination "is not unbounded," *State v. Drew*, 919 A.2d 397, 411 (R.I. 2007), and it may be "circumscribed within reasonable parameters of relevance in the sound discretion of the trial justice," *State v. Warner*, 626 A.2d 205, 209 (R.I. 1993). And we have made it clear that, when a criminal defendant "claims on appeal that the introduction of certain evidence violated his constitutional rights of confrontation and cross-examination, we review such an evidentiary ruling in a *de novo* manner." *State v. Moten*, 64 A.3d 1232, 1238 (R.I. 2013).

We have previously held that, in instances where a defendant fails to adequately raise his or her constitutional Confrontation Clause argument at trial, that issue has not been preserved for appellate review. *See Moten*, 64 A.3d at 1238. In arriving at this conclusion, we have emphasized that "a general objection is not sufficient to preserve an issue for appellate review; rather, assignments of error must be set forth *with sufficient particularity* to call the trial justice's attention to the basis of the objection." *Union Station Associates v. Rossi*, 862 A.2d 185, 192 (R.I. 2004)

- 48 -

(emphasis added); *see also Moten*, 64 A.3d at 1238. We indicated in *Moten* that the defense counsel's objection without any explanation as to the basis for that objection was insufficient to preserve the Confrontation Clause issue on appeal. *Moten*, 64 A.3d at 1239-40. Similarly, we determined that the defendant's Confrontation Clause argument in *State v. Johnson*, 251 A.3d 872 (R.I. 2021), had been waived because the defendant "did not raise a Confrontation Clause argument but, instead, merely argued that [the witness's] statements to police were probative and therefore admissible under the Rules of Evidence." *Johnson*, 251 A.3d at 885.

In the case at bar, our review of the record reveals that no objection on Confrontation Clause grounds was made to the trial justice's limiting of defense counsel's cross-examination of Ms. Onorato. In the questioning of Ms. Onorato about her heroin use, which took place outside the presence of the jury, the trial justice asked defense counsel: "So what Rule of Evidence do you ask her about * * * using heroin? Are you going to be saying, well, was she under the influence so her impressions aren't good?" Defense counsel answered in the affirmative. The trial justice ultimately sustained the state's objection to defense counsel's line of questioning as it pertained to Ms. Onorato's heroin use, stating that the "exception [was] noted" and that the offer of proof would be the *voir dire*. At no point was the trial justice alerted to a Confrontation Clause claim. Accordingly, this issue has not been properly preserved on appeal. *See State v. Figuereo*, 31 A.3d 1283, 1289 (R.I.

2011) (recognizing the "staunchly" adhered-to principle that this Court "will not review issues that were not presented to the trial court in such a posture as to alert the trial justice to the question being raised") (internal quotation marks omitted).

**D**

**The Testimony and Conduct of the Hernandez Brothers**

The defendant's next contention involves the testimony and conduct of Victor, Viclei, and Carlos Hernandez as well as the trial justice's eventual decision to hold each of these brothers in contempt. The defendant argues that the "testimony and conduct of the three brothers in front of the jury created a negative impression of the [defendant] that he could not challenge since the court ruled the witnesses could not be cross-examined. Allowing this unchallenged testimony to be submitted to the jury was clear error and prejudicial."

The state asserts that defendant has not established that the jury was present when: (1) both Victor and Viclei testified; (2) the trial justice prevented defendant from cross-examining them; and (3) Carlos was held in contempt. The state adds that, on "previous occasions, the court permitted inquiry of witnesses outside the presence of the jury to determine whether it would permit [defendant] to cross-examine them on certain topics." In addition, the state contends that "defense counsel did not object to the procedures that the court used to inquire about whether

Viclei and Victor intended to testify, suggest that the jury was present, or move for a mistrial."

We need not reach the substance of defendant's argument with respect to the conduct and testimony of the Hernandez brothers because this argument has not been properly preserved on appeal. According to the raise or waive rule, to which we staunchly adhere, "issues not properly presented before the trial court may not be raised for the first time on appeal." *Federal National Mortgage Association v. Malinou*, 101 A.3d 860, 865 (R.I. 2014); *see also Figuereo*, 31 A.3d at 1289 ("This Court staunchly adheres to the 'raise or waive' rule, which requires parties to raise an issue first in the trial court before raising it on appeal."). At trial, defendant did not take any action such as raising an objection to the trial justice's handling of the conduct and testimony provided by the Hernandez brothers or moving for a mistrial based on the same. As such, defendant's argument is deemed waived.

**E**

**The Alleged Assistance Provided by the Trial Justice to the Prosecution**

The defendant argues that the "trial justice impermissibly aided the prosecution" when, after sustaining multiple objections by the defense to the questions which the prosecutor was in the process of asking Neil Clapperton (the criminalist from the Crime Laboratory), the trial justice excused the jury, asked the prosecutor to review Rules 703 and 705 of the Rhode Island Rules of Evidence, and

"invited [the prosecutor] to sidebar off the record so she could approve the question before she brought the jury back." The state counters this argument by first noting that defendant did not preserve this issue for appeal. Second, the state points out that defendant's discussion of this issue does not "contain any legal authority to support his claim." Finally, the state argues that, even if the trial justice erred and even if the issue were preserved, the error would be harmless.

Our review of the record reveals that this issue has not been properly preserved for appeal. Other than objecting to the prosecutor's initial questioning of Mr. Clapperton, defense counsel did not object when the trial justice told the prosecutor to read the Rules of Evidence,[16] and there was no objection when the trial justice asked counsel to come to sidebar to further discuss the issue. As a result of the fact that defense counsel did not lodge an objection to the trial justice's actions in this regard, this issue has not been properly preserved for appellate review. *See State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I. 1999) ("According to our well-settled raise or waive rule, issues that were not preserved by a specific objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said

---

[16] We pause to note that, when instructing the prosecutor to read the Rules of Evidence, the trial justice stated: "[I]f you have any doubts, go talk to counsel, make phone calls. I'm just not going to allow the jury to hear improper question form."

objection, may not be considered on appeal.") (quoting *State v. Toole*, 640 A.2d 965, 972-73 (R.I. 1994)).

## F

### The Double Jeopardy Contentions

The defendant raises two issues pertaining to the constitutional right not to be placed in double jeopardy. First, defendant avers that Count Two, which "charged [defendant] with discharging a firearm while committing a crime of violence, murder, death resulting" and Count Five, which "charged [defendant] with discharging a firearm while committing a crime of violence, burglary, death resulting," should merge for double jeopardy purposes. Specifically, defendant contends that the "conduct for which [defendant] was charged in both counts was identical: firing the fatal shot into Richard Catalano." However, as the state points out in its brief, we need not reach the merits of this argument because defendant has failed to properly preserve it for our appellate review.

This Court has made it clear that, "[p]ursuant to Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure, the defense of double jeopardy may be raised *only by motion before trial.*" *State v. Segrain*, 252 A.3d 1255, 1269 (R.I. 2021) (internal quotation marks omitted). Consequently, "failure to raise such a motion before trial precludes that defendant from thereafter raising a double jeopardy challenge." *State v. Day*, 925 A.2d 962, 977 (R.I. 2007). It should be noted,

however, that that rule is not entirely inflexible, since we have stated that "[o]nly in limited circumstances will this [C]ourt review a claim of double jeopardy despite its improper assertion." *State v. Thomas*, 654 A.2d 327, 330 (R.I. 1995). In those limited circumstances, "the burden is on a defendant to show cause why relief should be granted notwithstanding the untimely assertion of the defense." *State v. Lee*, 502 A.2d 332, 334 (R.I. 1985); *see Segrain*, 252 A.3d at 1269.

In the case at bar, it is undisputed that defendant failed to file a pretrial motion to dismiss Count Five on the grounds of double jeopardy pursuant to Rule 12(b)(2). Indeed, upon a careful review of the entire record, it cannot be said that defendant brought this particular double jeopardy argument to the trial justice's attention at any point. The defendant simply moved for a judgment of acquittal on Count Five, and he summarily objected to the trial justice charging on both Count Two and Count Five.[17] Additionally, it is our opinion that the present case does not fall within one of the "limited circumstances" that would allow this Court to review this particular contention of double jeopardy because defendant has not successfully borne the burden of "show[ing] cause why relief should be granted notwithstanding the untimely assertion of the defense." *Lee*, 502 A.2d at 334; *see Segrain*, 252 A.3d at 1269 (stating that the case did not "constitute one of the 'limited circumstances'"

---

[17] We would also note that, at sentencing, the trial justice declined to impose a sentence on Count Five because she deemed it duplicative of Count Two.

- 54 -

and that there was therefore no need "to reach the merits of [the] defendant's belatedly raised double jeopardy contention") (internal quotation marks omitted). For these reasons, we will not assess the merits of defendant's belated double jeopardy contention as it relates to Count Two and Count Five.

As to defendant's second contention based on the double jeopardy clause, he argues that Count Six, which charged him with "assaulting [Lorie] Catalano with a dangerous weapon, a firearm" resulting in a shoulder injury, and Count Seven, which also charged him with assaulting Lorie Catalano with a dangerous weapon, resulting in a facial injury, should have merged. The defendant attempts to distinguish the facts of the present case from the facts of *State v. Haney*, 842 A.2d 1083 (R.I. 2004), to establish his assertion that, in this case, "everything occurred in the same place within a few minutes;" on that basis, he contends that Counts Six and Seven should have merged. We note that defendant did timely raise this particular double jeopardy argument in a motion to dismiss filed pursuant to Rule 12(b)(2); however, the trial justice deferred her consideration of the issue and suggested that defendant move for a judgment of acquittal on double jeopardy grounds, and she said that the issue would be properly decided at that time.

The state points out that defendant, who did not comply with the trial justice's suggestion made when she initially addressed the Rule 12(b)(2) motion to dismiss, never eventually moved for a judgment of acquittal on Count Six or Count Seven.

Although it is true that defendant did not raise this argument when he moved for a judgment of acquittal, we are nonetheless satisfied that the issue has been sufficiently preserved for review on appeal. A review of the record discloses that the trial justice did address the merger argument when she was instructing the jury. When discussing Counts Six and Seven during the jury instructions, defendant stated: "I believe Your Honor denied the motion." The trial justice replied: "If I didn't, I certainly do. * * * You shoot somebody twice over a period of time, I think it's two ADWs * * *." For these reasons, defendant has not forfeited his right to raise the double jeopardy argument, and we shall next address the merits of defendant's contentions.

We have previously stated that "[o]ur analysis of an alleged error based on double jeopardy principles is a mixed question of law and fact of constitutional dimension; thus, our review is *de novo*." *State v. Oliver*, 68 A.3d 549, 557 (R.I. 2013) (internal quotation marks omitted); *see State v. Stone*, 924 A.2d 773, 778 (R.I. 2007). However, we have further noted that, "within that review, we still accord a hearing justice's findings of historical fact, and inferences drawn from those facts, great deference." *Oliver*, 68 A.3d at 557 (internal quotation marks and deletion omitted); *see Rice v. State*, 38 A.3d 9, 16 (R.I. 2012).

It has long been established that the Fifth Amendment to the United States Constitution "protects criminal defendants from being 'twice put in jeopardy' for the

- 56 -

same offense." *State v. Bolarinho*, 850 A.2d 907, 909 (R.I. 2004). This Court employs the "same evidence test to determine whether a defendant has indeed been twice put in jeopardy." *Oliver*, 68 A.3d at 557 (internal quotation marks omitted); *see also State v. Scanlon*, 982 A.2d 1268, 1277 (R.I. 2009). This Court has indicated that the same evidence test "provides that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Oliver*, 68 A.3d at 557 (internal quotation marks omitted). We have further noted that "[a] double jeopardy situation arises when, for example, the state charges a defendant with two crimes arising from the *same act or transaction* and neither crime charged requires proof of an element that the other does not." *Haney*, 842 A.2d at 1084 (internal quotation marks omitted). In determining whether two crimes arise from the same transaction, this Court looks to "whether there was a break or stop in the behavior before it began in another place." *State v. Narcovich*, 244 A.3d 549, 559 (R.I. 2021).

In the instant case, the trial justice determined that Count Six and Count Seven arose from separate acts because the two assaults took place at different times and in different locations. We are unable to perceive any error in the trial justice's conclusion that Count Six and Count Seven did not arise from the same act or transaction and, as such, there was no violation of the double jeopardy clause. The

first act of shooting Lorie Catalano occurred at a separate place (albeit within the same house) from the location of the second shooting. And the two shootings occurred at different points in time. Lorie Catalano was first shot in the shoulder in her son's bedroom. The second act of shooting Lorie Catalano took place in the kitchen later—after she asked her son to see his wound and told him she was "going to clear it." It was Lorie Catalano's testimony that she had gone to the kitchen, where she joined her husband in struggling with defendant, who proceeded to shoot her in the face.

This Court notably emphasized the trial justice's finding in *Haney*: "The first assault had long since been completed before the second assault occurred. There were physical and temporal interruptions that broke any continuity." *Haney*, 842 A.2d at 1085. The same principle applies to the facts of this case. There was no continuity to the assaults due to the uncontradicted fact that they occurred in different rooms and at separate times. Although the shootings may have occurred shortly after each other and in the same house (albeit in different areas thereof), this does not lead to the conclusion that the assaults were "one continuing offense." *Id.* ("The fact that the parties may have continued to argue with each other during the interim does not mean that the assaults were one continuing offense."). Accordingly, the trial justice correctly determined that Count Six and Count Seven should not have merged pursuant to double jeopardy principles.

## G

## The Closing Argument

The defendant's next claim of error is that the prosecutor made two prejudicial statements in her closing argument: (1) when she suggested "that there was only one person left who could have pulled the trigger;" and (2) when she went on "for six sentences about how grievously Lorie Catalano suffered." Regarding the first allegedly prejudicial statement, defendant contends that "the state had stipulated that it had no evidence that the gunshot wound to [defendant] was self-inflicted." With respect to the second perceived error by the prosecutor, defendant argues that "[t]he sole purpose of this litany was designed to inflame the passions of the jury." Additionally, defendant contends that the curative instruction given by the trial justice "did not suffice to erase the harm done by the prosecutor * * *."

The state counters defendant's contentions by arguing that the first statement "was a response to defense counsel's closing argument and addressed the issue of who might have shot [defendant] * * *; the second was a summary of the injuries that Lorie sustained that night * * *." Additionally, the state asserts that defendant failed to preserve these issues for appeal because, while defense counsel did object to the statements at issue, he neither moved to pass the case nor did he request a cautionary instruction.

We have previously stated that "[i]t is well settled in our jurisprudence that, in order to preserve for appellate review the issue of prejudicial impropriety in a closing argument, a defendant must not only make an objection at the time when the allegedly improper comment is made, but he or she must also make a request for a cautionary instruction or move for a mistrial." *State v. Robat*, 49 A.3d 58, 83 (R.I. 2012) (internal quotation marks omitted); *see also State v. Fortes*, 922 A.2d 143, 149 (R.I. 2007). Although in the present case defense counsel did timely object to each of the statements with which he takes issue on appeal, he chose neither to move to pass the case nor to request a cautionary instruction. Accordingly, we deem this issue not to have been properly preserved for appeal. *See Robat*, 49 A.3d at 83 (stating that the issue of prejudicial impropriety in a closing argument is not preserved for appeal if there is a failure to properly follow the established procedure).

## H

## The "*De Facto* Life Without Parole Sentence"

The defendant's final argument is that the trial justice's imposition of "two consecutive life sentences, five twenty-year sentences each [to be] served consecutively, twenty-five years consecutive to serve without the opportunity to receive parole as a habitual offender, and numerous concurrent sentences * * * effectively sentenced [defendant] to life without parole." For its part, the state argues

that defendant "does not allege any error on the part of the Superior Court with respect to the sentence that it imposed or suggest that the sentence is either illegal or unconstitutional." Moreover, it is the state's position that defendant's challenge to his sentence is not ripe for review.

This Court has established that "a challenge to a criminal sentence must begin with the filing of a motion in the Superior Court pursuant to the provisions of Rule 35 of the Superior Court Rules of Criminal Procedure." *Day*, 925 A.2d at 985. Absent extraordinary circumstances, "we will not consider the validity or legality of a sentence on direct appeal * * *." *Id.* (internal quotation marks omitted).

In view of the fact that this is not an appeal from a ruling on a Rule 35 motion and in view of the further fact that we are aware of no extraordinary circumstances that would motivate us to deviate from our usual policy of not considering in this direct appeal the validity or legality of the sentence that was imposed,[18] we are not inclined to consider the defendant's argument that he received a "*de facto* life without parole sentence." *See Day*, 925 A.2d at 985.

---

[18] General Laws 1956 § 12-19.2-5 provides that a "defendant shall have the right to appeal a sentence of life imprisonment without parole to the supreme court of the state in accordance with the applicable rules of court." Notably, however, the defendant in this case did not receive a sentence of life imprisonment without parole.

## IV

## Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.  The record may be returned to that tribunal.


**Justice Long, concurring.**  I agree with the majority's disposition of Mr. Garcia's appeal.  However, I write separately to share my reservations related to Mr. Garcia's objection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986).  In my view, although the trial justice's decision upholding the peremptory strike of Juror 98 does not run afoul of the *Batson* doctrine, the circumstances surrounding the objection and decision nevertheless raise legitimate concerns that deserve attention and require intervention.

Equal justice under law mandates that individuals receive a criminal trial devoid of racial discrimination during the jury selection process.  *Porter v. Coyne-Fague*, 35 F.4th 68, 75 (1st Cir. 2022).  To carry out this mandate, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prevents the dismissal of even a single prospective juror for a discriminatory purpose.  *Id.*  The relevant test conducted to evaluate an alleged violation, as articulated in *Batson*, involves three steps.  First, a defendant must demonstrate a prima facie showing that the prosecution has used a peremptory strike on the basis

of race; second, if a defendant has succeeded in making that showing, the state must then offer a race-neutral basis for striking the prospective juror; and third, the trial justice must determine whether a defendant has successfully demonstrated that the prosecution engaged in purposeful discrimination. *Id.* at 76. The Supreme Court recently "enforce[d] and reinforce[d]" *Batson*'s three-part test in a case involving a Black defendant who was tried six times for the 1996 murder of four people at a furniture store in Winona, Mississippi. *Flowers v. Mississippi*, 588 U.S. 284, 287, 288 (2019). The Supreme Court described the history of peremptory strikes and the tension with the Equal Protection Clause prior to *Batson*; examined "the whole picture" surrounding the strike of one of the Black prospective jurors in the defendant's sixth trial; and ultimately reversed the judgment of conviction, holding that the trial court clearly erred in determining that the strike was not motivated in substantial part by discriminatory intent. *Id.* at 293-98, 313-14.[1]

---

[1] Following remand of the case to the Mississippi trial court for further proceedings, the Attorney General of Mississippi conducted an independent review of the matter. On September 4, 2020, the Attorney General filed a motion to dismiss the indictment and stated the following:

> "As the evidence stands today, there is no key prosecution witness that incriminates Mr. Flowers who is alive and available and has not had multiple, conflicting statements in the record. Additionally, this Court took judicial notice that another witness who testified against Mr. Flowers in the past, was later convicted of multiple counts of federal income tax fraud; she is now deceased. Several other

*Batson* arose out of an extensive and tortured history of individuals using the jury selection process to prevent Black members of American society from participating in jury service. *See Strauder v. West Virginia*, 100 U.S. 303, 312 (1879) (invalidating a statute that prevented all nonwhite individuals from serving on juries); *Carter v. Texas*, 177 U.S. 442, 448 (1900) (invalidating a systemic practice that prohibited Black jurors from serving on cases involving Black criminal defendants); *Hale v. Kentucky*, 303 U.S. 613, 616 (1938) (vacating a conviction after the defendant successfully demonstrated that Kentucky jury commissioners systematically excluded Black jurors); *Pierre v. Louisiana*, 306 U.S. 354, 362 (1939) (same); *Neal v. Delaware*, 103 U.S. 370, 397 (1881) (same); *Norris v. Alabama*, 294 U.S. 587, 599 (1935) (same). Although *Batson* is the controlling legal authority intended to prevent this pernicious practice, contemporary efforts to curtail Black

---

material witnesses are also dead and unavailable to testify about the events that occurred twenty-four years ago. As the Court noted at the bail review hearing, the only witness who offered direct evidence of guilt recanted his prior testimony, admitting that the was lying when he said Mr. Flowers made a jailhouse confession to the murders. Moreover, the Court was made aware of alternative suspects with violent criminal histories, as well as possible exculpatory evidence not previously considered.

"Given the facts and circumstances of this case, and based on the totality of circumstances, it is in the interest of justice that the State will not seek an unprecedented seventh trial of Mr. Flowers."

jury service persist. *See generally Flowers*, 588 U.S. 284; *Porter*, 35 F.4th 68; *State v. Clegg*, 867 S.E.2d 885 (N.C. 2022).

In a concurring opinion issued when *Batson* was decided in 1986, Justice Marshall identified numerous concerns with this newly created doctrine along with the inherently problematic nature of peremptory strikes. *See Batson*, 476 U.S. at 102-05 (Marshall, J., concurring). Specifically, Justice Marshall highlighted the severe limitations placed on a trial judge's ability to uphold *Batson*'s mandate. *Id*. at 106. ("Any prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are illequipped to second-guess those reasons. * * * If such easily generated explanations are sufficient to discharge the prosecutor's obligation to justify his strikes on nonracial grounds, then the protection erected by the Court today may be illusory."). Importantly, Justice Marshall recognized the challenges associated with preventing what we now understand to be implicit bias from entering the jury selection process. *Id.* ("A prosecutor's own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically. A judge's own conscious or unconscious racism may lead him to accept such an explanation as well supported."). As a result of these concerns, Justice Marshall ultimately concluded that eliminating peremptory strikes altogether constituted the only way to end jury discrimination. *Id.* at 107-08.

Nearly twenty years later, Justice Breyer voiced his own apprehension regarding the inherent shortcomings of the *Batson* doctrine and the continued use of peremptory challenges in a problematic manner. *See Miller-El v. Dretke*, 545 U.S. 231, 273 (2005) (Breyer, J., concurring); *see also Rice v. Collins*, 546 U.S. 333, 344 (2006) (Breyer, J., concurring). Justice Breyer opined that the ongoing use of peremptory challenges had the potential to weaken the jury's function in our democratic system. *See Miller-El*, 545 U.S. at 272 ("If used to express stereotypical judgments about race, gender, religion, or national origin, peremptory challenges betray the jury's democratic origins and undermine its representative function."). He noted that the Constitution does not mandate the use of peremptory challenges in our legal system before declaring that the Supreme Court should reconsider the practice of peremptory challenges. *Id.* at 273 ("And, of course, the right to a jury free of discriminatory taint is constitutionally protected—the right to use peremptory challenges is not."). Furthermore, he echoed Justice Marshall in recognizing the difficult challenge for trial courts when evaluating the *Batson* framework. *See Rice*, 546 U.S. at 343.

The case before this Court illustrates the prescience of Justice Marshall and the astute perceptiveness of Justice Breyer. In evaluating Mr. Garcia's claim of error under *Batson*, our narrow task is to consider whether all of the relevant facts and circumstances, taken together, establish that the trial justice clearly erred in

determining that the state's peremptory strike of Juror 98 was not motivated in substantial part by a discriminatory intent. After applying the *Batson* framework to this matter, I am compelled to reach the same result as the majority: The trial justice did not clearly err when she concluded that Mr. Garcia failed to demonstrate that the state engaged in purposeful discrimination when it struck Juror 98. Nevertheless, after examining "the whole picture" surrounding the strike of Juror 98, it, in my view, depicts an awkward, uncomfortable scene that calls into question whether implicit biases may have been at play; and further presents issues that are difficult for this Court to evaluate pursuant to our present standard.

Upon being called to occupy seat nine in the jury box, Juror 98 stopped at sidebar to share that her son was incarcerated in Massachusetts. After confirming that Juror 98 could be fair, the trial justice asked questions that she had posed to other jurors, including whether Juror 98 could listen with an open mind to witnesses with a criminal conviction; whether the defendant's ethnicity bothered her; and whether she watches the television show "CSI." The trial justice then asked, "If the State proves each and every element of the crime charged by proof beyond a reasonable doubt, would you find the Defendant guilty?" The following exchange occurred in response:

"[JUROR 98]:  Um, if they prove --

"THE COURT:  If they prove the case beyond a reasonable doubt, could you come back and say 'guilty'?

"[JUROR 98]:  You have to like consider that. You have to be like -- I don't know.

"THE COURT:  You have to consider all the evidence put before you.

"[JUROR 98]:  All the evidence.

"THE COURT:  And the law that I give to you.

"[JUROR 98]:  You have to be really careful with that.

"THE COURT:  But would you, beyond a reasonable doubt?  I gave the definition, and I'll give it again. But they don't have to prove the case beyond all doubt or beyond a shadow of a doubt.  The Defendant is entitled to the benefit of a doubt based on reason, but he's not entitled to the benefit of any and all doubts.
    Now, would you hold the State to a higher standard than that because of the nature of the charges, or would you accept that instruction?

"[JUROR 98]:  That's hard to say.

"THE COURT:  It's hard to say?

"[JUROR 98]:  Yeah.

"THE COURT:  You're not sure you would be able to come back guilty even if they proved it beyond a reasonable doubt?  I see you're hesitating, and I appreciate the fact that you're pondering it.  It's really, really important.

"[JUROR 98]:  It's hard.

"THE COURT: It's okay. It's really important. This is the most important question I think I've asked you. If the State proves their case beyond a reasonable doubt, can you come back and stand up and say 'guilty'? Be honest. There's no right or wrong answer. Only a truthful answer.

"[JUROR 98]: I never been in this situation before.

"THE COURT: I know. Well, is there anything about you that would prevent you from sitting in judgment against somebody in a case like this?

"[JUROR 98]: I never been in a situation like this. I don't even know what to say.

"THE COURT: No, no. Are you a person who just can't sit in judgment?

"[JUROR 98]: I probably can't.

"THE COURT: I'm not suggesting it to you. I'm trying to get --

"[JUROR 98]: I understand what you're saying.

"THE COURT: You would have to make a decision --

"[JUROR 98]: That decision, I don't think I can.

"THE COURT: You don't think you can do it?

"[JUROR 98]: No.

"THE COURT: Anything further? [Defense Counsel], would you like to inquire further?

"[DEFENSE COUNSEL]: It's tough being questioned. The purpose of the trial is for the jurors to decide, after hearing all the evidence, whether the Defendant is guilty

- 69 -

or not.  If you hear all the evidence, and if you think he's guilty, is there anything that keeps you -- will you be willing to join the others and say he's guilty?

"[JUROR 98]:  If I think he's guilty, yeah.

"[DEFENSE COUNSEL]:  All right.  If the Judge tells you what the law is, the State has to prove its case beyond a reasonable doubt.  And if you feel the State does prove this case beyond a reasonable doubt, will you be able to follow the Judge's instructions and find him guilty?

"[JUROR 98]:  Yes, I would.  I would be able to follow the instructions."

When the state had an opportunity to ask questions of Juror 98, the prosecutor returned to the concept of proof beyond a reasonable doubt and drew an objection from defense counsel for telling Juror 98, "[Y]ou seemed hesitant."  The trial justice interjected:

"THE COURT:  I will say that when I asked the juror about beyond a reasonable doubt, and I gave kind of a shorthand version, I did say that the State has to prove each and every element of the charges by what we refer to as beyond a reasonable doubt.  A Defendant is entitled to a doubt based on reason, and if you find a doubt based on reason, then they didn't prove it.  However, he's not entitled to a benefit of any and all doubt.  They don't have to prove it beyond a shadow of a doubt or --

"[JUROR 98]:  Well, I --

"THE COURT:  Mere suspicion is not sufficient.  In other words, they have to prove it beyond a reasonable doubt.  You can't find them guilty if you suspect he did it.  Okay?

"[JUROR 98]:  Mmm-hmm.

"THE COURT:  If the State proves beyond a reasonable doubt that the Defendant is guilty of the crimes charged, could you in your heart of hearts stand up and say 'guilty'?

"[JUROR 98]:  I could, if they found him guilty.

"THE COURT:  If the State fails to prove him guilty beyond a reasonable doubt, could you stand up and say 'not guilty' even though it's a very -- you heard about all the --

"[JUROR 98]:  Even though if I --

"THE COURT:  No.  If you think he's guilty and they proved it, you said you could find him guilty.  But what if you feel they didn't prove it?  Maybe you suspect he's guilty, but they didn't prove it beyond a reasonable doubt.  Could you say 'not guilty'?

"[JUROR 98]:  If they didn't prove it, that's hard.

"THE COURT:  That's hard for you?

"[JUROR 98]:  Yeah.

"THE COURT:  Why is that?

"[JUROR 98]: I don't know.

"THE COURT:  Tell me.

"[JUROR 98]:  I couldn't work in the court system.

"THE COURT: Okay.  If the State doesn't prove each and every element of the crime charged beyond a reasonable doubt, even if you suspect the Defendant did it but they didn't prove it, even if it's a strong suspicion, but they

- 71 -

didn't prove it beyond a reasonable doubt, in spite of the nature of these charges, could you come back and say 'not guilty'?  Can you do that?

"[JUROR 98]:  If they didn't prove it?

"THE COURT:  Yes.

[PAUSE]

"THE COURT:  You're hesitating.

"[JUROR 98]:  If I feel they didn't prove it, and I feel he's not guilty, or if I feel he's guilty --

"THE COURT:  You might feel he's guilty, but the question is if they didn't prove it.  You might feel he's guilty, but you feel they didn't prove it beyond a reasonable doubt.  Can you come back and even if you kind of feel he's guilty, but they didn't prove it beyond a reasonable doubt, can you come back and say 'not guilty'? Take your time.

"[JUROR 98]:  I can't say that he's guilty if they didn't prove it.

"THE COURT:  Thank you.  Okay.  Just relax.  You may inquire further."

At that prompt, the prosecutor asked Juror 98 a broad, open-ended question that she did not ask of any of the other forty-five members of the venire: "Is there *anything about your background* that would give you reservation about sitting on this jury?" (Emphasis added.)

The transcript reveals that Juror 98 was unclear about what the prosecutor was asking. The exchange proceeded as follows:

> "[JUROR 98]: Like what? What do you want to know? I don't have no, how do you say it, no criminal background myself.
>
> "[THE STATE]: Maybe something to do with your son's experience. Do you think that would hinder your ability to be fair and impartial in this case?
>
> "[JUROR 98]: No, not what's going on with my family, no. That's totally different."

Defense counsel referred to this open-ended questioning when he objected to the state's attempt to strike Juror 98, arguing that it was "a little more probing than some of the other jurors." He seemed to anticipate that the state would refer to the communication difficulties that Juror 98 exhibited during the voir dire as a race-neutral reason to strike her; he asserted that those deficiencies would amount to pretextual reasons for striking her.[2]

Rather than simply asking the state to provide race-neutral reasons for the peremptory strike; proceeding to evaluate defense counsel's arguments; and weighing the credibility of the prosecutor, including by assessing the prosecutor's demeanor, *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); the trial justice instead

---

[2] Defense counsel also seemed to recognize the awkwardness of arguing that the prosecutors were engaging in purposeful discrimination; he concluded his step one argument by saying, "[n]ot to insult anybody."

- 73 -

repeatedly characterized the objection as "insulting" before asking the state to articulate the race-neutral reasons for striking Juror 98. In my view, this exchange illustrates what Justice Marshall and Justice Breyer recognized as the difficult challenge facing trial judges:

> "[T]he trial judge's uncertainty about the legal validity of the exercise of peremptory challenges * * * may reflect the more general fact that, sometimes, no one, not even the lawyer herself, can be certain whether a decision to exercise a peremptory challenge rests upon an impermissible racial, religious, gender-based, or ethnic stereotype. * * * How can trial judges second-guess an instinctive judgment the underlying basis for which may be a form of stereotyping invisible even to the prosecutor?" *Rice*, 546 U.S. at 343.

The uncomfortable reality is that trial judges may succeed in applying the *Batson* framework but fail to "prevent racial discrimination from seeping into the jury selection process." *Flowers*, 588 U.S. at 302.

The Supreme Court's holding in *Batson* established the federal constitutional floor in cases involving jury discrimination; state courts—including this Court—remain free to expand protections regarding jury selection under their respective constitutions.[3] *See, e.g.*, *State v. Andujar*, 254 A.3d 606, 626 (N.J. 2021) (imposing additional requirements before the state may conduct background checks on

---

[3] Although this Court possesses the authority to consider Mr. Garcia's jury-discrimination objection pursuant to the Rhode Island Constitution, the parties did not raise this issue in this matter.

prospective jurors); *State v. Fleming*, 239 A.3d 648, 654 (Me. 2020) (requiring trial courts "to thoroughly probe the issue of racial bias").  State courts also remain free to prevent discriminatory practices and the taint of racial bias through other means. Three years after the Supreme Court decided *Batson*, the highest court of Connecticut exercised its "inherent supervisory authority over the administration of justice" and eliminated step one of the *Batson* test for criminal cases brought in the state courts. *State v. Holloway*, 553 A.2d 166, 171-72 (Conn. 1989).  The Connecticut Constitution protects the right of litigants to strike jurors peremptorily, but recently, the high court has summoned a task force to investigate and propose broad changes to the state's jury-selection process.  *See State v. Jose A.B.*, 270 A.3d 656, 672-73, 677 (Conn. 2022).

Similarly, the highest courts in other jurisdictions have undertaken to use their rulemaking authority to identify and resolve their perceived shortcomings in the *Batson* doctrine.  *See* Thomas Ward Frampton & Brandon Charles Osowski, *The End of Batson? Rulemaking, Race, and Criminal Procedure Reform*, 124 Colum. L. Rev. 1, 22-35 (2024).  Notably, the Arizona Supreme Court has eliminated the use of peremptory strikes altogether. *Id.* at 35-49.

We must remain vigilant of the ways that we can continue to curtail jury discrimination whenever possible. *See Clegg*, 867 S.E.2d at 917 (Earls, J., concurring) ("If we are to give more than lip service to the principle of equal justice

under the law, we should not bury our heads in the sand and pretend that thirty-five years of experience with *Batson* will magically change. There are a variety of tools at our disposal, we urgently need to use them."). It is my opinion that this vigilance must also take place in our contemporary analysis of past caselaw. As an example, the majority approvingly cites *State v. Austin*, 642 A.2d 673 (R.I. 1994), for the proposition that striking a juror based on the fact that they have an incarcerated family member constitutes a "race-neutral" rationale pursuant to *Batson*. *See Austin*, 642 A.2d at 678. Given the reality of mass incarceration in the United States and the overwhelming, if not universal, consensus that this movement has disproportionally affected people of color, this "race-neutral" justification manifests itself as thinly veiled pretextualism. *See generally* Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (2010); Dorothy E. Roberts, *The Social and Moral Cost of Mass Incarceration in African American Communities*, 56 Stan. L. Rev. 1271, 1272-73 (2004) ("African Americans experience a uniquely astronomical rate of imprisonment, and the social effects of imprisonment are concentrated in their communities.").

Additionally, I join the growing number of jurists calling for the revision of jury-selection procedures in state courts. *See, e.g.*, *State v. Wellknown*, 510 P.3d 84, 100 (Mont. 2022) (Baker, J., concurring); *State v. Vandyke*, 507 P.3d 339, 346 (Or. Ct. App. 2022) (Aoyagi, J., concurring); *State v. Aziakanou*, 498 P.3d 391, 407 n.12

(Utah 2021); *State v. Veal*, 930 N.W.2d 319, 340, 359 (Iowa 2019) (Cady, C.J., concurring) (Wiggins, J., concurring) (Appel, J., concurring in part and dissenting in part). In my view, this Court should exercise its general supervisory authority to correct errors and abuses in the jury-selection process by promulgating a rule that eliminates the use of peremptory strikes in jury trials and directs trial justices to apply heightened scrutiny to the exercise of for-cause strikes. General Laws 1956 § 8-1-2; *see People v. Suarez*, 471 P.3d 509, 567 (Cal. 2020) (Liu, J., concurring) ("Thus, although much attention has appropriately been paid to the inefficacy of *Batson v. Kentucky* * * * in combating racial discrimination in peremptory strikes, there is significant evidence that removal of jurors for cause is an equally if not more significant contributor to the exclusion of Black jurors, which may result in juries with higher levels of implicit bias.").

The rulemaking process is a holistic way for this Court to seek input from a variety of stakeholders within Rhode Island's legal community and to arrive at a solution that will allow Rhode Island's judges to continue to uphold our oath to "administer justice without respect to persons * * * ." General Laws 1956 § 8-3-1.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI 02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Dari Garcia. |
| **Case Number** | No. 2019-205-C.A. (P1/15-394AG) |
| **Date Opinion Filed** | July 2, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice William P. Robinson III |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State: <br><br> Christopher R. Bush <br> Department of Attorney General <br><br> For Defendant: <br><br> George J. West, Esq. |